# EXHIBIT  B

STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT (together with the Schedules and Appendices hereto, the "Agreement"), dated as of July 19, 2005 (the "Closing Date"), by and among Lerner New York, Inc., a Delaware corporation (the "Purchaser") and Luciano Manganella, a Massachusetts resident (the "Shareholder").

W I T N E S S E T H :

WHEREAS, Jasmine Company, Inc., a Massachusetts corporation (the "Company") is engaged in the retail sale of clothes, footwear and related accessories under the "Jasmine Sola" and "Luisa Luisa" names (the "Business");

WHEREAS, the Shareholder is the record and beneficial owner of 100,300 shares of common stock, no par value per share of the Company (the "Company Shares") representing all of the issued and outstanding capital stock of the Company;

WHEREAS, the Shareholder desires to sell to the Purchaser, and the Purchaser desires to purchase from the Shareholder, the Company Shares, the Business, and all the goodwill associated therewith; all for the consideration and on the terms set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I.

Purchase and Sale

Section 1.1  Sale of Shares.  Subject to the terms and conditions of this Agreement, the Shareholder does hereby sell, transfer, convey, assign and set over ("Transfer") to the Purchaser, and the Purchaser does hereby purchase and acquire from Shareholder, all of Shareholder's right, title and interest in and to the Company Shares, free and clear of all Liens.

Section 1.2  Purchase Price.  As consideration for the Transfer of the Company Shares to the Purchaser, and for the other representations, warranties and covenants of Shareholder hereunder, the Purchaser:

(A)     is at the Closing, (1) paying Shareholder $15,500,000 in cash by wire transfer of immediately available funds receipt of which payment the Shareholder hereby acknowledges, (2) paying $7,000,000 into escrow pursuant to Section 1.4 (the foregoing two payments in aggregate amount of $22,500,000, the "Cash Closing Payments"); and (3) causing its Affiliate New York & Company, Inc. (the "Issuer") to issue to the

Shareholder 350,000 shares of the Issuer's common stock (such shares, the "Closing Shares"); and

(B)     following the Closing, cause the Issuer to issue to the Shareholder up to 200,000 shares of the Issuer's common stock (with such number of shares to be adjusted for stock splits, recapitalizations, and the like between the Closing and issuance) (the "Post-Closing Shares") pursuant to and in accordance with Schedule 1.2(B).

The foregoing consideration payable or issuable by the Purchaser is referred to herein as the "Purchase Price." The Purchase Price is subject to adjustment, following the Closing, pursuant to Section 1.5.

Section 1.3  Closing Obligations.

A.     Shareholder Deliveries.  At the Closing, the Shareholder is delivering:

(i)     duly executed forms of transfer in respect of, and share certificates for, the Company Shares, accompanied by duly executed stock · transfer powers in blank;

(ii)     the employment agreements between the Company and the Shareholder and Stacey Manganella, respectively, in the forms attached to Schedule 1.3(A) (the "Employment Agreements") and executed by the Shareholder and Stacey Manganella, respectively;

(iii)     the Registration Rights Agreement between the Issuer and the Shareholder, in the form attached to Schedule 1.3(A) (the "Registration Rights Agreement") and executed by the Shareholder;

(iv)     The Escrow Agreement (as defined in Section 1.4), executed by the Shareholder;

(v)     the additional agreements, documents, certificates and materials listed on Schedule 1.3(A); and

(vi)     a certificate of non-foreign status in the form attached to Schedule 1.3(A) dated as of the day immediately preceding the Closing Date, sworn under penalty of perjury.

B.     Purchaser Deliveries.  At the Closing, the Purchaser is delivering:

(i)     the Cash Closing Payments, by wire transfer of immediately available funds, ; and

(ii)    the Closing Shares;

(iii)   the Employment Agreements, executed by the Company;

(iv)   the Registration Rights Agreement, executed by the Issuer;

(v)    the Escrow Agreement, executed by the Purchaser; and

(v)    the additional agreements, documents, certificates and materials listed on Schedule 1.3(B).

The stock certificates, stock powers and transfer documents described in Section 1.3(A)(i), along with the other documents listed in Schedule 1.3(A) and Schedule 1.3(B) are referred to collectively as the "Additional Transaction Documents."

Section 1.4  Escrow. Simultaneously with the Closing, the Purchaser is depositing $7,000,000 into escrow pursuant to that Escrow Agreement between the Purchaser, the Shareholder and Goulston & Storrs, P.C., as escrow agent (the "Escrow Agreement"), with such deposit being made as security with respect to the Shareholder's obligations to pay liquidated damages of $7,000,000 in the event of a Major Employment Breach pursuant to Section 6.16. The parties agree that the foregoing Escrow Agreement, with Goulston & Storrs, P.C. as escrow agent, is intended to be a temporary arrangement and that they will use commercially reasonable efforts to enter into escrow arrangements with a third party escrow agent on terms substantially similar to such initial Escrow Agreement, as quickly as reasonably practicable (and in such event, the escrow agreement entered into in connection with such new arrangements shall thereupon constitute the "Escrow Agreement" for all purposes hereunder).

Section 1.5.  Purchase Price Adjustment.

A.    Adjustments. The Purchase Price shall be adjusted: (1) upward or downward to the extent that the Closing Working Capital Level is greater or less than $1,936,000, respectively; and (2) upward or downward to the extent that Closing Long Term Indebtedness is less than or greater than $195,091, respectively; and (3) downward in an amount equal to any Closing Transaction Expenses; and (4) downward in an amount equal to any Undisclosed Special Liabilities; all as determined pursuant to this Section 1.5. Any adjustment to the Purchase Price shall take into account, and be the net result of, all of the adjustments described in the preceding clauses (1), (2), (3) and (4), and is referred to herein as the "Net Adjustment."

B.    Certain Definitions. As used herein: (1) the term "Closing Working Capital Level" means Working Capital Levels of the Closing Date; (2) the term "Working Capital Level" means the Company's current assets (i.e., cash; merchandise inventory; prepaid expenses; loans receivable; and prepaid corporate taxes) minus the Company's current liabilities (i.e., note payable under line of credit; current portion of long-term debt; accounts payable, trade; accounts payable, other; sales taxes payable; and accrued payroll and expenses), (3) the term "Closing Long Term Indebtedness" means the Company's long-term debt (net of current portion) as of the Closing Date; (4) the term "Transaction Expenses" means the fees and expenses incurred on or

before the Closing Date (whether or not invoiced) and payable by the Company to third parties related to or arising out of the transactions contemplated by this Agreement, or any transaction involving the sale of all or substantially all of the Company's assets or capital stock, since January 1, 2005, that the Company and/or the Shareholder have considered (including any "auction process" conducted on the Company's or the Shareholder's behalf prior to the date hereof), including travel, legal, accounting, investment banking and other professional fees and expenses relating thereto, and 50% of the Company's outstanding fees payable to Schulte Roth & Zabel LLP (totalling $90,000), and Transfer Taxes for which the Shareholder is liable pursuant to Section 5.2(F), in each case that are not paid as of the Closing Date; and (5) the term "Undisclosed Special Liabilities" means (1) any indebtedness of the Company pursuant to deferred compensation obligations; (2) any "change in control" payments required of the Company as a result of the Closing; (3) any indebtedness pursuant to a guarantee by the Company of the obligations of another Person, (4) any obligations (including breakage costs) payable by the Company under interest rate protection agreements (including interest rate swaps, caps, floors and collars) and in respect of any hedging agreements; and (5) any obligations under capital leases; provided however that none of the foregoing shall constitute Undisclosed Special Liabilities if they have otherwise been disclosed either (I) under Schedules 3.1(D), 3.1(E), or 3.1(F) (or arise pursuant to Commitments or other arrangements disclosed under said schedules, including without limitation the leases of the Leased Realty) or (II) expressly identified within the Financial Statements (including the notes thereto). In the case of any guarantee described in the foregoing clause (3), the Purchaser agrees that the Shareholder shall be given reasonable opportunity (not to exceed 30 days) after notice from the Purchaser in order to terminate, at his own cost and expense, such guarantee prior to such guarantee being considered as an Undisclosed Special Liability hereunder. Notwithstanding anything herein to the contrary, Working Capital Levels, Closing Long Term Indebtedness (and "debt" and "indebtedness") will be determined in accordance with GAAP, consistently applied and consistent with the Financial Statements. By way of example, as of April 30, 2005, the Working Capital Level was $1,711,432 (current assets of $5,970,539 minus current liabilities of $4,259,107) and the long term debt (net of current portion) was $195,091.

C.    Within sixty (60) days following the Closing, the Shareholder shall prepare or cause to be prepared, and deliver to Purchaser his calculation of (1) Assumed Closing Working Capital Level, (2) Closing Long Term Indebtedness, (3) Transaction Expenses, (4) Undisclosed Special Liabilities; and (5) the Net Adjustment (the "Shareholder Calculations").

D.    Within thirty (30) days after its receipt of the Shareholder Calculations, the Purchaser shall cause its accountants to review the same. If Purchaser has any objection to any such calculations, or to any of the figures shown on the Shareholder Calculations, the Purchaser shall, within such thirty (30) day period, inform the Shareholder in writing thereof (the "Purchaser's Objection"), setting forth in reasonable detail the basis for its objection and the adjustments to the Net Adjustment shown in the Shareholder Calculations which the Purchaser believes should be made. The Shareholder shall then have thirty (30) days after his receipt of a Purchaser's Objection to review and respond to the Purchaser's Objection ("Shareholder's Review Period"). If the Purchaser and the Shareholder are unable to resolve all of their disagreements with respect to the determination of the Net Adjustment within ten (10) days after the end of the Shareholder's Review Period, they shall refer their remaining disagreements to a

-4-

nationally known accounting firm reasonably acceptable to the Purchaser and the Shareholder (the "Accounting Firm"), who shall determine, on the basis of the standards, principles and methods set forth herein, and only with respect to the remaining disagreements submitted to them (and only, with respect to such disputed items, within the parameters of the respective calculations thereof as have been previously provided by the Purchaser and/or the Seller, respectively), whether and to what extent the Net Adjustment shown on the Shareholder Calculations requires adjustment. The Purchaser and the Shareholder shall direct the Accounting Firm to deliver its report and determination of such adjustments as quickly as reasonably possible. The Accounting Firm's determination shall be final, conclusive and binding upon the Purchaser and the Shareholder. The fees and disbursements of the Accounting Firm shall be paid by the party whose calculation of the Net Adjustment was furthest from the Accounting Firm's determination. The Purchaser and the Shareholder shall make readily available to the Accounting Firm all relevant books and records and any work papers (including those of the parties' respective accountants) relating to the Financial Statements and the Shareholder Calculations and all other items reasonably requested by the Accounting Firm. The "Final Adjustment" shall be (i) the Net Adjustment set forth in the Shareholder Calculations in the event that (x) no Purchaser's Objection is delivered to the Shareholder during the thirty (30) day period specified above, or (y) the Shareholder and the Purchaser so agree, (ii) the Net Adjustment, adjusted in accordance with the Purchaser's Objection in the event that the Shareholder does not respond to Purchaser's Objection within the Shareholder's Review Period, or (iii) the Net Adjustment, as adjusted by either (x) the agreement of the Shareholder and the Purchaser or (y) the Accounting Firm.

E.    The Purchaser shall provide the Shareholder and his accountants full access to the books and records of the Business, to any other information, including work papers of its accountants (to the extent available to the Purchaser), and to any employees to the extent necessary for the Shareholder to prepare the Shareholder Calculations. The Purchaser and its accountants shall have full access to all information used by the Shareholder in preparing the Shareholder Calculations, including the work papers of their accountants (to the extent available to the Shareholder).

F.    Within ten (10) days following issuance of the Final Adjustment, the adjustment payments payable pursuant to this Section 1.5 shall be paid by wire transfer of immediately available funds to a bank account designated by Purchaser or Shareholder, as the case may be.; plus, in either case, interest thereon from the Closing Date through the date of payment at the rate of interest publicly announced by Citibank, N.A. or any successor thereto in New York, New York from time to time as its "base rate" (the "Interest Rate")

ARTICLE II.

Closing

Section 2.1  Closing Date.  The closing of the transactions contemplated hereby (the "Closing") is occurring at the offices of Goulston & Storrs, P.C., Boston, MA, USA on the Closing Date (i.e., the date of this Agreement).  The Closing shall be deemed effective as of 12:01 a.m. Eastern Time on the Closing Date.

Section 2.2  Effect of Closing.  All matters at the Closing shall be considered to take place simultaneously, and no delivery of any document or instrument shall be deemed complete until all transactions and deliveries of documents and instruments and payments contemplated by this Agreement are completed or have been waived by the party to whom delivery or payment was due hereunder.

ARTICLE III.

Representations and Warranties by the Shareholder

Section 3.1  Representations and Warranties.  The Shareholder hereby represents and warrants to the Purchaser that:

A.    Corporate Existence and Qualification of the Company and the Shareholder; Authority, Due Execution, Ownership of Shares, Etc.

(i)    The Company is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Massachusetts and is duly qualified to do business, and is in good standing, in each jurisdiction in which the failure to be so qualified would reasonably be expected to have a Material Adverse Effect, which such jurisdictions are set forth on Schedule 3.1(A).

(ii)    The Company has the requisite corporate power and authority to own, lease or otherwise hold its Assets and to conduct the Business as now conducted and presently proposed to be conducted.  The Company has no Subsidiaries.  Assuming the due execution of this Agreement by the Purchaser, this Agreement constitutes the valid and binding obligation of the Shareholder enforceable against such Shareholder in accordance with its terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to creditors' rights generally and to general principles of equity (regardless of whether such enforcement is considered in a proceeding at law or in equity).

(iii)    As of immediately prior to the Closing, the authorized capital stock of the Company consists of 275,000 shares of common stock. The Company Shares constitute all of the issued and outstanding capital stock of the Company, and the Company Shares are owned beneficially and of record by the Shareholder, free and clear of all Liens. The Company Shares and are duly authorized, validly issued and are fully paid and non-assessable.

(iv)    The Company does not have outstanding (1) any stock or securities convertible into or exchangeable for any shares of its capital stock or containing any profit participation features, nor any options, warrants, agreements, arrangements, preemptive rights, or other rights of any Person to acquire, or any other Liens on, any capital stock of the Company or (2) any stock or securities convertible into or exchangeable for any stock appreciation rights or phantom stock or similar plans or rights. The Company is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock. There are no outstanding stock appreciation, phantom stock, profit participation, or similar rights with respect to the Company. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of any capital stock of the Company.

B.    No Violation.

(i)    Neither the execution, delivery and performance by the Shareholder of this Agreement or the Additional Transaction Documents to which such Person is party, nor the consummation of the Contemplated Transactions by the Shareholder, will (A) violate any order, ruling, writ, judgment, injunction or decree of any Governmental Entity (an "Order") applicable to the Shareholder or the Company; (B) conflict with, result in a breach of, constitute a default under, or violate the Charter Documents of the Company; or (C) result in the imposition of any Lien on the Company Shares.

(ii)    Neither the execution, delivery and performance by the Shareholder of this Agreement or the Additional Transaction Documents to which he is party, nor the consummation of the Contemplated Transactions by the Shareholder, will violate any Law, or give others any rights of termination, amendment, acceleration or cancellation of, any Commitment (other than as disclosed on Schedule 3.1(B) or Schedule 3.1(E)) applicable to the Shareholder or the Company or by which any of the Company's properties is bound or affected, excluding, for purposes of this Section 3.1(B)(ii), any Commitment which is for goods or services which are readily replaceable on comparable economic terms and conditions and without material incremental cost, and the termination of which would not materially impair the normal operations of the Business.

(iii)    Except as set forth on Schedule 3.1(B) or Schedule 3.1(E)), no consent, authorization, or approval from, or registration or filing with, any Governmental Entity or other third party (not obtained or made as of the date hereof), is required to be obtained or made by the Shareholder in connection with the execution, delivery or performance of this Agreement or the Additional Transaction Documents, or the consummation by the Shareholder of the Contemplated Transactions, except for such consents, authorizations, or approvals under any Commitment which is for goods or services which are readily replaceable on comparable

-7-

economic terms and conditions and without material incremental cost, and the termination of which would not materially impair the normal operations of the Business..

C.    Financial Information.  Set forth on Schedule 3.1(C) are copies of unaudited balance sheets and related statements of income of the Company for the year ended December 31, 2004, and for the four months ended April 30, 2005, respectively (collectively, the "Financial Statements").  The Financial Statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods presented (except as required to comply with changes to GAAP), except that the Financial Statements do not contain footnotes and, with respect to the Financial Statements for the four months ended April 30, 2005, are subject to year end adjustments, none of which would either singly or in the aggregate be material.  Subject to the foregoing, the Financial Statements present fairly in all material respects the financial condition and results of operations of the Company as of the dates or for the periods presented.  The aforementioned balance sheet as of April 30, 2005, is sometimes referred to herein as the "April 30, 2005 Balance Sheet."

D.    Absence of Certain Changes or Events.  Except as set forth on Schedule 3.1(D), since December 31, 2004, the Company has conducted the Business only in the Ordinary Course of Business, there have not been any changes in the business, operations, assets, financial condition or cash flow of the Company which in the aggregate has had, or is reasonably likely to have, a Material Adverse Effect, and the Company has not since such date:

(i)    changed its authorized or issued capital stock; issued any notes, bonds or other debt or equity securities convertible into capital stock; or granted any registration rights with respect to any securities;

(ii)    amended its Charter Documents;

(iii)    paid, granted or increased any bonuses, salaries or other compensation by the Company to any of its directors, officers, or employees except for bonus awards and increases in salaries in the Ordinary Course of Business, as required by applicable Laws or pursuant to any Commitment listed or referred to on Schedule 3.1(E);

(iv)    mortgaged, pledged, imposed any security interest upon or subjected to any Lien any of its properties or Assets, tangible or intangible, other than Permitted Liens and for those Liens securing indebtedness expressly identified in the balance sheet within, or notes to, the Financial Statements at December 31, 2004 or expressly identified in the balance sheet within the Financial Statements at April 30, 2005;

(v)    sold, assigned, licensed, transferred, leased or otherwise disposed of any Asset, tangible or intangible (including Intellectual Property), except in the Ordinary Course of Business;

(vi)    cancelled or waived any material claims or material rights against third Persons;

(vii)    changed its accounting methods or principles (including without limitation accounting methods and principles used for tax purposes), except for any such changes required by GAAP;

(viii)    entered into, accelerated, modified or terminated or received notice of termination of any Commitment material to the operation of the Business;

(ix)    suffered any damage to or destruction or loss of any Asset of the Company in excess of $25,000;

(x)    adopted, amended, modified or terminated or increased any payments to or benefits under any Company Plans in any material respect;

(xi)    incurred any Company Indebtedness, other than in the Ordinary Course of Business or as expressly identified in the balance sheet within, or notes to, the Financial Statements at December 31, 2004 or as expressly identified in the balance sheet within the Financial Statements at April 30, 2005;

(xii)    made capital expenditures or commitments therefor that aggregate in excess of $75,000, other than capital expenditures in connection with store build-outs or renovation consistent with the Company's 2005 budget (with total budgeted amount therein of $1,272,000);

(xiii)    made any loans or advances to, guarantees for the benefit of, or any investments in, any Persons or formed any Subsidiary;

(xiv)    directly or indirectly engaged in any transaction with any officer, director, partner, shareholder, employee or other Affiliate of the Company or the Shareholder, to the extent any of the foregoing creates any Liability of the Company following the Closing;

(xv)    taken any action or otherwise omitted to take any action that could reasonably be expected to result in the loss, lapse, abandonment, invalidity or unenforceability of any material Business Intellectual Property (as defined below);

(xvi)    granted any license or sublicense of any rights under or with respect to any Intellectual Property Rights; or

(xi)    agreed, orally or in writing, to do any of the foregoing (to the extent such agreement is currently binding upon the Company or could result in Liability to the Company following the Closing).

As used herein, the "Ordinary Course of Business" means the ordinary course of the Business, as operated by the Company consistent with past practices.

E.    Contracts.

(i)    Schedule 3.1(E) lists or references all contracts, agreements, or obligations, whether written or oral, including all amendments thereto (collectively, "Commitments") to which the Company is currently a party or otherwise bound of the following types:

(a)    Any such Commitment relating to the employment of any current employee of the Company, or any severance or change in control payment to any employee, or any labor contract or collective bargaining agreement, or any Commitment providing for payments to any Person as a result of termination of employment or based upon sales, purchases or profits other than direct payment for goods and which require minimum payments of at least $50,000 per year;

(b)    Any such Commitment or series of related Commitments for capital expenditures or the acquisition or construction of fixed assets which requires or require aggregate future payments or expenditures in excess of $75,000 in total;

(c)    Any such Commitment granting to any Person a first-refusal, first-offer or other right to purchase, acquire or use  (1) any of the Assets of the Company (other than purchase or sales orders, which pursuant to the terms thereof requires aggregate annual payments to or by the Company in excess of $50,000, or (2) the Company Shares;

(d)    Any such Commitment with respect to a joint venture or partnership arrangement, under which the Company is or has agreed to become a joint venturer or partner or otherwise has agreed to share profits, losses, costs or liabilities with any other Person;

(e)    Any such Commitment pursuant to which the Company is a lessee of any Leased Realty requiring annual payments by the Company in excess of $150,000;

(f)    Any powers of attorney to which the Company is a party;

(g)    Any such Commitment that contains any provision that in any material way prohibits the Company from engaging in any line of business or competing with another Person within the geographic territory in which the Company sells goods, or restricts the use of any Business Intellectual Property or prohibits the use of any Intellectual Property (including settlement and coexistence agreements);

(h)    Any other such Commitment which is not cancelable on 60 days or less notice and which pursuant to the terms thereof requires annual payments by the Company in excess of $50,000 (any such Commitment under this sub-clause (h), a "Material Commitment");

(i)    Any agreement or indenture relating to Company Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset or material group of assets of the Company;

(j)      Any such Commitment pursuant to which the Company grants or obtains any license or other rights to any Intellectual Property (other than licenses of "off the shelf" software which are readily available on a commercial or retail basis with a replacement cost and/or annual license fee of less than $10,000).

(ii)      Except as set forth on Schedule 3.1(E) or Schedule 3.1(B), (a) all Commitments listed on Schedule 3.1(E) are now and will be, immediately following the Transfer of the Company Shares at the Closing, in full force and effect, and represent the valid and binding obligation of the Company, and, to the knowledge of the Shareholder, each of the other parties thereto; (b) the Company has performed all obligations required to be performed by it and is not in default under or in breach of nor in receipt of any claim of default or breach under any Material Commitment; (c) no event has occurred which with the passage of time or the giving of notice or both would reasonably be expected to result in a default, breach or event of noncompliance by the Company under any Material Commitment; and (d) the execution, delivery and performance of the Commitments listed on Schedule 3.1(E) by the Company are not in violation of the Charter Documents of the Company, except to the extent that such any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

(iii)      Except as set forth on Schedule 3.1(H): (a) the Company holds all permits, licenses, approvals, consents and authorizations issued by any Governmental Entity or other Person and which are required by applicable Laws and material to its operation of the Business (collectively, "Licenses").  Neither the Company nor the Shareholder has received notice of any Legal Proceeding and, to the knowledge of the Shareholder, no such Legal Proceeding has been threatened, which would, if successful on the merits, lead to a revocation, suspension, or limitation of the rights of any such Licenses, and the Company is in material compliance with each of its such Licenses, and (b) to the knowledge of the Shareholder, all applications required to have been filed for renewal of any such Licenses have been duly filed on a timely basis with all appropriate Governmental Entities or other Persons and all other filings required to have been made with respect to such Licenses have been made on a timely basis with all appropriate Governmental Entities or other Persons,

F.      Title to and Condition of Properties.

(i)      Schedule 3.1(F)(i) lists all real estate owned, leased or otherwise occupied by the Company.  The Company has valid leasehold or subleasehold interests in any property identified as "Leased Realty" on said schedule (the "Leased Realty") and the Company owns its other Assets; in each case free and clear of Liens other than Permitted Liens.

As used herein, the term "Lien" means any charge, claim, option, lien, mortgage, encumbrance, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, and the term "Permitted Liens" means any Liens which (1) are listed on Schedule 3.1(F); (2) are for Taxes or other charges or assessments of any Governmental Entity which are not yet due and owing or are subject to a good faith dispute, are not material in amount and are being pursued diligently by appropriate Legal Proceedings; (3) constitute Liens of carriers, warehousemen, mechanics and materialmen,

-11-

or similar Liens, incurred in the Ordinary Course of Business and for which adequate reserves have been established in accordance with GAAP; (4) constitute statutory Liens in favor of landlords with respect to real property leased, or protective UCC filings in favor of lessors of personal property leased, to the Company; or (5) with respect to real property only, are minor imperfections in title, and do not materially detract from the value or interfere with the current use of the property subject to such Liens; (6) are restrictions on transfer or change in control provisions which are disclosed in Schedule 3.1(B) or Schedule 3.1(E); (7) are restrictions or limitations arising under Laws (including zoning and land use restrictions and restrictions relating to the transfer of securities); or (8) restrictions created by or arising under any of the Commitments disclosed in Schedule 3.1(E).

   (ii) Neither the Company nor the Shareholder has received notice of any condemnation proceedings and, to the knowledge of the Shareholder, no condemnation proceedings have been threatened, in each case with respect to any of the Leased Realty, and no such property has been condemned. Neither the Company nor the Shareholder has received notice of any Legal Proceedings, and, to the knowledge of the Shareholder, no Legal Proceedings have been threatened, that could, with the passage of time or otherwise, give rise to a Lien (excluding a Permitted Lien) against the Company's leasehold interests in the Leased Realty.

   (iii) Except as set forth in Schedule 3.1(F)(ii) or Schedule 3.1(B), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) the consummation of the transaction contemplated by this Agreement does not require the consent of any other party to such Lease, will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; and (iii) neither the Company nor to the Shareholder's knowledge any other party to the Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would reasonably be expected to result in a breach or default (excluding defaults which would not reasonably be expected to result in any material Liability to the Company) or permit the termination, modification or acceleration of rent under such Lease.

   (iv) To the knowledge of the Shareholder, the landlord under the Company's Brattle Street Leases does not intend to terminate such lease as a result of the Contemplated Transactions, or to refuse to renew the expired leases relating to the Brattle Street store on commercially reasonable terms. As used herein the term "Contemplated Transactions" means the transactions contemplated by this Agreement and the Additional Transaction Documents.

  G. Intellectual Property Assets.

   (i) Set forth on Schedule 3.1(G) is a list of all patents and patent applications, registered Marks (as defined below) and applications for the registration of Marks, registered copyrights and copyright applications, and similar material intellectual property rights which are owned by or licensed to the Company or used in the Business as currently conducted or proposed to be conducted; excluding in any case "off the shelf" software or similar property which is readily available on a commercial or retail basis with a replacement cost and/or annual license

fee of less than $10,000. Except as set forth on <u>Schedule 3.1(G)</u>, (1) to the knowledge of the Shareholder, the use of the Business Intellectual Property, as currently used or proposed to be used by the Company, does not conflict with, misappropriate or infringe upon any Intellectual Property rights of others; (2) to the knowledge of the Shareholder, no other Person is conflicting with, infringing on, or misappropriating (or has in the past conflicted with, infringed on, or misappropriated) the rights of the Company in such Business Intellectual Property; and (3) no claims (including office actions by Governmental Entities) with respect to the Business Intellectual Property have been made or, to the knowledge of Shareholder threatened, contesting the validity, use, ownership, enforceability or registrability of any of the Business Intellectual Property, nor, to the knowledge of the Shareholder, is there any reasonable basis for any such claim.

       (ii)    The Company owns all right, title, and interest in and to, free and clear of all Liens (other than Permitted Liens) or has a valid and enforceable right to use without payment to a third party (except for payments due under Material Commitments or other Commitments listed on <u>Schedule 3.1(E)</u>) all Intellectual Property which is necessary or used in the operation of the Business (together with the Intellectual Property owned by the Company, collectively the "<u>Business Intellectual Property</u>"). Any such usage rights do not require payment to a third party on account of such Business Intellectual Property (except for payments due under Material Commitments or other Commitments listed on <u>Schedule 3.1(E)</u>). The transactions contemplated by this Agreement shall not adversely affect the right, title or interest of the Company in or to the Business Intellectual Property, and all of the Business Intellectual Property shall be owned or available for use by the Company immediately after the Closing on terms and conditions identical to those under which the Company owned or used the Business Intellectual Property immediately prior to the Closing. The Company is listed as the record owner of each registration or application for registration of Business Intellectual Property. No past or present employee or consultant of the Company has or, together with the Shareholder, will have as a result of the consummation of the transactions contemplated by this Agreement, any ownership interest, license, permission or other right in or to any Business Intellectual Property.

      H.    <u>Compliance With Laws</u>. Except as set forth on <u>Schedule 3.1(H)</u>, the Company has complied and is in compliance with all Laws (including the provisions of the Occupational Safety and Health Act (29 U.S.C.A. § 651 <u>et seq.</u>) ("<u>OSHA</u>") except to the extent that (a) any prior (and not current) noncompliance of such laws would not reasonably be expected to result in a Material Adverse Effect, and (b) any current noncompliance is not material to the operations of the Business. The Company has not received any notices from Governmental Entities alleging any noncompliance with laws, excluding notices which have been withdrawn or which relate to matters which have been resolved and settled in full by the Company prior to Closing. This Section 3.1(H) is not intended to cover Laws relating to the issuance of Licenses, which are addressed in Section 3.1(E)(iii), Environmental Laws, which are addressed in Section 3.1(J), ERISA and other employee benefit Laws (including Laws relating to pension matters), which are addressed in Section 3.1(K), or Tax Laws, which are addressed in Section 3.1(N).

      I.    <u>Litigation</u>. Except as set forth on <u>Schedule 3.1(I)</u>, there are no Legal Proceedings pending or, to the knowledge of the Shareholder, threatened against the Company or the

Shareholder that seek to enjoin or obtain damages in respect of the consummation of the transactions contemplated by this Agreement, or that otherwise relate to the Business.

J.      Compliance With Environmental Laws.  To the Shareholder's knowledge, except as set forth on Schedule 3.1(J): (a) the Company is in compliance with all Environmental Laws applicable to the operation of the Business; and (b) within the past two (2) years neither the Company nor the Shareholder has received any written notice from any Governmental Entity asserting a violation of any Environmental Law in connection with the operation of the Business by the Company.  As used herein the term "Environmental Law" means: (1) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq.; (2) the Toxic Substances Control Act, 15 U.S.C. §2101 et seq.; (3) the Hazardous Materials Transportation Act, 49 U.S.C. §5101 et seq.; (4) the Federal Water Pollution Control Act, 32 U.S.C. §1251 et seq.; (5) the Federal Solid Waste Disposal Act, 42 U.S.C. §6901 et seq.; (6) the Federal Clean Air Act, 42 U.S.C. §1857 et seq. and (7) OSHA (but only to the extent such law in this clause (7) applies to the use, storage, transportation, discharge, or release of Hazardous Materials by such company), each as amended to date.  Notwithstanding anything herein to the contrary, all matters relating to Laws applicable to the protection of the environment generally, or of land, water or air specifically, or to discharges, releases, creation, storage or transportation of Hazardous Materials, including any Liabilities arising thereunder, shall be governed exclusively by this Section 3.1(J).

K.      Employees and Employee Benefit Programs.

(1)      Employees.  Schedule 3.1(K)(1) contains a complete and accurate list of the employees of the Company as of the date hereof and the rate of all current compensation payable by the Company  to each such employee, including any bonus, contingent or deferred compensation.

(2)      Employee Benefit Programs.  Set forth on Schedule 3.1(K)(2) is a complete and correct list of each "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and each other benefit plan, program or arrangement maintained, sponsored or contributed or required to be contributed to by the Company or with respect to which the Company has any current or potential liability.  All such plans, programs or arrangements are collectively referred to as the "Company Plans."  With respect to each Company Plan, the Company has heretofore delivered or made available to the Purchaser, as applicable: (i) complete and correct copies of the Company Plan and any amendments thereto (or if the Company Plan is not a written agreement, a description thereof); (ii) summary plan descriptions; (iii) all related insurance contracts, other funding arrangements and administrative services agreements; and (iv)  all other documents pursuant to which such Company Plan is maintained, funded and administered.  Each Company Plan has been maintained, funded and administered in accordance with its terms and in material compliance with the applicable provisions of ERISA, the Internal Revenue Code of 1986, as amended (the "Code") and other applicable Laws.  Except as required by COBRA (as defined below), the Company does not have any obligation with respect to any Company Plan, no actions, investigations, hearings, proceedings, audits, examinations, suits or claims (other than routine claims for benefits in the Ordinary Course of Business) are pending, or, to the

Shareholder's knowledge, threatened. The Company does not have any obligation with respect to any post-retirement or post-termination medical or life insurance or other similar benefits.

(3)    <u>General Compliance Matters.</u>  Neither the Company nor any ERISA Affiliate has ever maintained, had an obligation to contribute to, contributed to, or incurred any liability with respect to (1) any "employee pension benefit plan" within the meaning of ERISA Section 3(2); or (2) any pension plan that is or was subject to Title IV of ERISA or Section 401(a) of the Code. Neither the Company nor any ERISA Affiliate has engaged in a prohibited transaction, as such term is defined under Code Section 4975 or ERISA Section 406, which would subject to the Company to any taxes, penalties or other liabilities under Section 4975 of the Code or ERISA Sections 409 or 502(i). Neither the Company nor any ERISA Affiliate has ever contributed to or been required to contribute to any multiemployer plan (as defined in Section 3(37) of ERISA). Neither the Company nor any ERISA Affiliate has any current or potential liability (including withdrawal liability as defined in ERISA Section 4201) under any multiemployer plan (as defined in Section 3(37) of ERISA). As used above, the term "ERISA Affiliate" means any Person that is or was at any time treated as a single employer under IRC Section 414 with the Company.

(4)    <u>COBRA Compliance.</u>  Except as set forth on <u>Schedule 3.1(K)(2)</u>, the Company and each ERISA Affiliate have complied and are in compliance with the requirements of Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state Laws ("COBRA").

L.    <u>Labor Relations.</u>  Except as set forth on <u>Schedule 3.1(L)</u>, the Company is not party to any collective bargaining agreement or other similar labor Commitment. Except as set forth on <u>Schedule 3.1(L)</u>: (i) there are, and since January 1, 2000 have been, no strikes, work slowdowns or stoppages, widespread picketing, or formal employee grievance processes pending or, to the knowledge of the Shareholder, threatened against the Company, and (ii) the Company is not currently a party to, or, to the knowledge of the Shareholder, currently threatened with, any Legal Proceeding by any employee or former employee-or Governmental Entity relating to any alleged violation of Law pertaining to labor relations or employment matters, including any Laws relating to wages and hours, worker's compensation or immigration.

M.    <u>Insurance.</u>  All policies of insurance relating to the Business with respect to any periods which include the Closing Date are valid and enforceable and in full force and effect and will continue to be in full force and effect following the Closing. A summary of the Company's current insurance coverages is set forth on <u>Schedule 3.1(M)</u>. All premiums, including any current or retrospective premiums or other like arrangement with respect to such policies of insurance which are currently maintained, have been paid when due with respect to all periods prior to the date hereof. No notice of cancellation or termination has been received by the Company or Shareholder with respect to any such policy of insurance, and except as set forth on <u>Schedule 3.1(M)</u> no claim relating to the Business is currently reserved or, to the knowledge of the Shareholder, should be reserved, under any such policy of insurance involving an amount in excess of $150,000 (excluding provisional notices of prospective non-renewal for insurance policies which are routinely sent, not in response to any specific casualty event or loss history, by insurance companies within a certain period before such policy would normally expire).

-15-

N.    <u>Taxes</u>. The Company has timely filed all Tax Returns and reports required to be filed by or with respect to it pursuant to applicable Law, and such Tax Returns are accurate, complete and correct in all material respects. The Company has paid all Taxes due and payable by it (whether or not shown on such Tax Returns), and there are no other Taxes payable on account of the Company except for Taxes which are not yet due and for which the Company has made adequate reserves, accruals and charges in its books and records of account in accordance with GAAP. The Shareholder has delivered or made available to the Purchaser complete and correct copies of all federal and state income Tax Returns, examination reports, and statement of deficiencies assessed against, or agreed to by the Company for all taxable periods ended on or after December 31, 1998. <u>Schedule 3.1(N)</u> lists the dates since January 1, 1998 as of and for which the federal and state corporate income/franchise, sales/use and other Tax Returns of the Company were audited and closed and lists the jurisdictions in which the Company files any such Tax Return. Except as separately set forth and identified on <u>Schedule 3.1(N)</u>, there is no Tax audit or examination or any judicial or administrative proceedings now being conducted, pending or, to the Shareholder's knowledge, threatened with respect to the Company. Except as set forth on <u>Schedule 3.1(N)</u>, since January 1, 1998, no correspondence or claim has been received by the Company or the Shareholder from any taxing authority of any jurisdiction in which the Company does not file Tax Returns that the Company is or may be subject to taxation by such jurisdiction. There are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax. All Taxes which the Company was or is required by Law to withhold or collect have been and are being withheld or collected by it and have been timely paid over to the proper Governmental Entities or, if not yet due, are being held by the Company for such payment. Except as set forth on <u>Schedule 3.1(N)</u>, neither the Shareholder nor the Company has waived, extended or agreed to extend any applicable statute of limitations relating to any Tax assessment or deficiency of the Company or agreed to any extension of time for filing any Tax Return of the Company which has not been filed. There is no dispute with or asserted claim by any taxing authority concerning any Tax liability of the Company. To the Shareholder's knowledge no taxing authority intends to assess any additional Taxes for any period for which Tax Returns of the Company have been filed. The Company has never been a member of an Affiliated Group or filed or been included in a combined, consolidated or unitary income Tax Return, and the Company is not a party to and is not bound by any Tax allocation or Tax sharing agreement. The Company has not distributed stock of another Person, nor has it had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code. The Company has not engaged in any reportable transaction within the meaning of Section 6111 and 6112 of the Code. Neither the Company nor the Shareholder has requested or received a ruling from any taxing authority or signed any binding agreement with any taxing authority that might impact any tax attribute of or the amount of Tax due from the Company on or after the Closing Date. All of the Company's nonqualified deferred compensation plans (within the meaning of Section 409A of the Code), if any, are in compliance with Section 409A of the Code. The Shareholder is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code. The Company is not liable for the Taxes of another Person (i) under Treasury Regulation § 1.1502-6 (or comparable provisions of state, local or foreign Law), (ii) as a transferee or successor, (iii) by contract or indemnity or (iv) otherwise; and will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period

(or portion thereof) ending after the Closing Date as a result of any (A) change in method of accounting for a taxable period ending on or prior to the Closing Date, (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax Law) executed on or prior to the Closing Date, (C) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign income Tax Law), (D) installment sale or open transaction disposition made on or prior to the Closing Date, or (E) prepaid amount received on or prior to the Closing Date. The Company (and any predecessor of the Company) has been a validly electing S corporation within the meaning of Code Sections 1361 and 1362 at all times since July 1, 1988. The Company has not, during its last ten taxable years, acquired any assets to which Section 1374(d)(8) of the Code would be applicable. The Company has consistently used the accrual method of accounting, and has not used the cash receipts and disbursements method of accounting, for federal state and local income tax purposes. Notwithstanding anything herein to the contrary, each representation and warranty within this Section 3.1(N) shall be deemed to be preceded by the clause "except as set forth on Schedule 3.1(N)."

O.    <u>Brokers' Fees</u>. Neither the Company nor the Shareholder has entered into any Commitment which will cause the Purchaser or the Company (following the Closing) to become obligated for any broker's, finder's or other similar fee or commission in connection with this Agreement or the consummation of any of the transactions contemplated hereby, except for Tri-Artisan Partners LLC, whose fees and expenses in respect of such transactions shall be paid by the Shareholder.

P.    <u>Vendor Matters</u>. <u>Schedule 3.1(P)</u> lists the top 25 vendors of the Company for the period therein described. Except as set forth on <u>Schedule 3.1(P)</u>: (1) the relationship of the Company with each such vendor of the Company is a good commercial working relationship, and there are no material unresolved disputes between the Company and any such vendors; (2) the Company has no chargebacks or other liabilities to vendors which are required (or which will be required) to be accrued or recorded under GAAP in excess or $100,000 and which are not so accrued or recorded on the Company's financial records; (3) no such vendor within the last twelve (12) months has canceled or otherwise terminated, or threatened to cancel, or to the knowledge of the Shareholder, intends to cancel or terminate, its relationship with the Company, and (4) during the last twelve (12) months there has been no material interruption in the Company's supply arrangements with such vendors.

Q.    <u>Affiliated Transactions</u>. Except as set forth on the attached <u>Schedule 3.1(C)</u>, <u>Schedule 3.1(D)</u> or <u>Schedule 3.1(E)</u> (and excluding employment, the Shareholder's ownership of the Shares, and the prior payment of personal expenses of any Key Employee which have been reimbursed in full), no officer, Key Employee, director, shareholder or Affiliate of the Company or the Shareholder, or any individual related by blood, marriage or adoption to any such individual, or any entity in which any such Person or individual owns any beneficial interest (excluding passive interests of less than 5% of the equity of any such entity), is a party to any agreement, contract, commitment or transaction with the Company (to the extent currently binding on the Company) or has any material interest in any material property used by the

Company. As used above, the term "Key Employee" means the Shareholder, Stacey Manganella, and Percy Pava.

R. <u>Accredited Investor</u>. Shareholder is an accredited investor as such term is defined in Regulation D promulgated pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"). Shareholder acknowledges and agrees that the Closing Shares are being issued and sold in reliance on the exemption from registration contained in Section 4(2) of the Securities Act and exemptions contained in applicable state securities laws, and that the Closing Shares cannot and will not be transferred except in a transaction that is exempt under the Securities Act and those state acts or pursuant to an effective registration statement under the Securities Act and those state acts or in a transaction that is otherwise in compliance with the Securities Act and those state acts. Shareholder understands that he has no contractual right for the registration under the Securities Act of the Closing Shares for public sale other than pursuant to the Registration Rights Agreement and that, unless the Closing Shares are registered or an exemption from registration is available, the Closing Shares may be required to be held indefinitely. The Closing Shares to be acquired by Shareholder pursuant to this Agreement shall be acquired for Shareholder's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any applicable state securities laws, and the Closing Shares shall not be disposed of in contravention of the Securities Act or any applicable state securities laws. Shareholder is sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Closing Shares. Shareholder is able to bear the economic risk of his investment in the Shareholder Stock for an indefinite period of time because the Closing Shares have not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

Section 3.2. <u>No Implied Representations</u>. Notwithstanding anything to the contrary herein: (1) it is the explicit intent and acknowledgement of each party hereto that the Shareholder has not made and is not making any representation or warranty whatsoever, express or implied, other than those expressly given in Section 3.1 of this Agreement, and the Purchaser is not relying on any other statement, representation or warranty, oral or written, express or implied, made by the Shareholder or the Company or their respective Affiliates, representatives or agents, including any such statement, representation or warranty contained in any offering memorandum or any information, document or material made available to the Purchaser or its Affiliates, representatives or agents in any "data rooms," management presentations or any other form in expectation of the transactions contemplated by this Agreement and the Additional Transaction Documents; and (2) the Purchaser has undertaken its own analyses and methodologies to value the Company and the Business, and in no event shall the Shareholder be charged with knowledge of, or have responsibility for, such analyses or methodologies or the valuation resulting therefrom. EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN SECTION 3.1 OF THIS AGREEMENT, THE SHAREHOLDER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OR REPRESENTATION.

ARTICLE IV.

Representations and Warranties of the Purchaser

Section 4.1     <u>Representations and Warranties</u>.  The Purchaser represents and warrants to the Shareholder that:

A.     <u>Corporate Existence and Qualification; Due Execution, Etc</u>.  The Purchaser is a corporation duly organized and validly existing under the Laws of the State of Delaware and has the requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Purchaser and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite corporate action and, assuming the due execution of this Agreement by the Shareholder, this Agreement constitutes the valid and binding obligations of the Purchaser enforceable against the Purchaser in accordance with its terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to creditors' rights generally and to general principles of equity (regardless of whether such enforcement is considered in a proceeding at law or in equity).

B.     <u>No Violation</u>.

(i)     Neither the execution, delivery and performance by the Purchaser of this Agreement or the Additional Transaction Documents, nor the consummation of the Contemplated Transactions by the Purchaser, will (A) violate any Order applicable to the Purchaser or (B) result in a breach of or default under, the Charter Documents of the Purchaser; except for such violations which would not reasonably be expected to have a material adverse effect on the Purchaser's ability to perform its obligations under this Agreement or the Additional Transaction Documents, or to consummate the Contemplated Transactions.

(ii)     Neither the execution, delivery and performance by the Purchaser of this Agreement or the Additional Transaction Documents, nor the consummation of the Contemplated Transactions by the Purchaser, will violate any agreement or Law applicable to the Purchaser; except for such violations which would not reasonably be expected to have a material adverse effect on the Purchaser's ability to perform its obligations under this Agreement or the Additional Transaction Documents, or to consummate the Contemplated Transactions.

(iii)     No consent, authorization, or approval from, or registration or filing with, any Governmental Entity or other third party (not obtained or made as of the date hereof) is required to be obtained or made by or with respect to the Purchaser in connection with the execution and delivery of this Agreement or the consummation by the Purchaser of the transactions contemplated hereby; except for such violations which would not reasonably be expected to have a material adverse effect on the Purchaser's ability to perform its obligations under this Agreement or the Additional Transaction Documents, or to consummate the Contemplated Transactions.

C.    Litigation. There are no Legal Proceedings pending or, to the knowledge of the Purchaser, threatened against the Purchaser that seek to enjoin or obtain damages in respect of the consummation of the transactions contemplated by this Agreement.

D.    Financial Ability to Perform. The Purchaser has available cash funds sufficient to consummate the transactions contemplated by this Agreement.

E.    Purchase for Investment. The Purchaser is acquiring the Company Shares for investment and not with a view toward any resale or distribution thereof except in compliance with applicable Laws, including the Securities Act.

F.    Brokers' Fees. The Purchaser has not made any agreement, which will cause the Company, or the Shareholder to become obligated for any broker's or other similar fee or commission as a result of any of the transactions contemplated by this Agreement.

ARTICLE V

Covenants and Agreements

Section 5.1    Section 338(h)(10) Election

A.    At the Purchaser's option, the Shareholder and the Purchaser shall join in making a timely election under Code Section 338(h)(10) (and any corresponding elections under state, local, or foreign tax law) (collectively, the "Section 338(h)(10) Election") with respect to the purchase and sale of the stock of the Company. The parties agree that the Purchase Price and the liabilities of the Company (plus other relevant items) will be allocated to the assets of the Company for all purposes as set forth in a schedule to be provided by the Purchaser to the Shareholder (and subject to the Shareholder's reasonable approval) within 120 days after the Closing Date. In the event that the Purchaser and the Shareholder cannot agree on such allocation within a reasonable period of time prior to the due date for filing the Section 338(h)(10) Election, then such allocation shall be finally determined by a nationally recognized accounting firm reasonably acceptable to the Purchaser and the Shareholder. The Purchaser, the Shareholder, and the Company shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

B.    For purposes of this Agreement, "Extra Tax Cost" means the amount, if any, of all incremental federal, state, and local Taxes imposed on the Shareholder or the Company as a result of the Section 338(h)(10) Election (assuming, solely for purposes of this calculation, that all of the Shareholder's representations and warranties set forth in Section 3.1(N) are true and correct), compared to the federal, state, and local Taxes that would have been imposed on the Shareholder or the Company in the absence of the Section 338(h)(10) Election (including, without limitation, a gross-up for any Taxes imposed on the Shareholder as a result of the payment of the Extra Tax Cost). The Extra Tax Cost shall be calculated using the highest marginal federal, state, and local Tax rates (taking into account the federal Tax benefit of any state and local Taxes) applicable to individuals living in the state of Massachusetts on income of the relevant character.

-20-