C.     Notwithstanding anything herein to the contrary, the Shareholder and the Purchaser agree that as between the Shareholder and the Purchaser, the Purchaser shall be responsible for any and all Extra Tax Costs, and in furtherance thereof: (i) the Purchaser shall cause the Company to promptly pay when due any Extra Tax Cost imposed on the Company; and (ii) the Purchaser shall pay the amount of any Extra Tax Cost imposed on the Shareholder concurrently with the payment of any such Extra Tax Cost by the Shareholder (with payments pursuant to this clause (ii) to be made within 10 days after delivery to the Purchaser of evidence showing payment by the Shareholder of an Extra Tax Cost imposed on him). The Purchaser shall include with the allocation schedule to be provided pursuant to clause (a) above its calculation of the Extra Tax Cost. The amount of Extra Tax Cost paid to the Shareholder shall be treated as an increase to the Purchase Price.

Section 5.2     <u>Tax Matters</u>.

A.     <u>Tax Periods Ending on or before the Closing Date</u>. The Shareholder shall prepare and file or cause to be prepared and filed all Tax Returns for the Company and the Business for all periods ending on or prior to the Closing Date which are filed after the Closing Date. Each such Tax Return described in the preceding sentence shall be subject to review and approval by the Purchaser (which approval shall not be unreasonably withheld) prior to filing; provided, however, that with respect to any dispute involving the calculation any Tax liability under Section 1374 of the Code with respect to assets acquired from Flirt, Inc., the Accounting Firm shall determine such calculation consistent with the dispute resolution provisions of Section 1.5. The Shareholder shall pay and be liable for all Taxes of the Company with respect to such periods or which arise in respect of any event, action, or transaction which occurred during such periods, excluding, however, Extra Tax Costs.

B.     <u>Tax Periods Beginning on or after the Closing Date</u>. The Purchaser shall prepare and file or cause to be prepared and filed when due all Tax Returns for the Company for all periods beginning on or after the Closing Date. The Purchaser shall pay and be liable for all Taxes of the Company with respect to such periods or which arise in respect of any event, action, or transaction which occurred during such periods.

C.     <u>Tax Periods Beginning Before and Ending After the Closing Date</u>. The Purchaser shall prepare and file or cause to be prepared and filed when due any Tax Returns of the Company for Tax periods which begin before the Closing Date and end after the Closing Date. The Purchaser shall permit the Shareholder to review and comment on each such Tax Return described in the preceding sentence prior to filing. Subject to Section 5.2(G), the Shareholder shall deliver to the Purchaser, at least three (3) business days prior to the date on which such Taxes are required to be paid, that portion of the Taxes which relates to the portion of such taxable period ending on the day immediately preceding the Closing Date (the "Pre-Closing Straddle Period Taxes"), excluding, however, Extra Tax Costs. For purposes of this Section 5.2(C), in the case of any Taxes (other than Extra Tax Costs) that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the day immediately preceding the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the day immediately preceding the Closing Date shall (i) in the

-21-

case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the day immediately preceding the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant taxable period ended on the day immediately preceding the Closing Date.  Subject to the proration provisions of the preceding sentence, any credits or refunds relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the day immediately preceding the Closing Date.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Company.

D.    Contest Proceedings.  With respect to any Tax Returns for any Tax periods, the party hereto responsible for the preparation and filing of such Tax Return shall control the defense of any audits thereof or other Legal Proceedings relating thereto, *provided* that the costs of any such defense shall be shared by the parties hereto, pro rata based on their responsibility for Taxes due under any such Tax Return, and *provided further* that no such audits or other Legal Proceedings shall be settled in a manner which would adversely affect the other party hereto without the prior written consent of such other party, which consent shall not be unreasonably withheld.

E.    No Withholding.  Payment by the Purchaser to the Shareholder of the Purchase Price shall be made in full without any deduction or withholding, whether in respect of set-off, counterclaim, or Taxes (other than any Taxes imposed on the Shareholder that are based on net income or profits or any Taxes required by law to be withheld by the Purchaser).

F.    Transfer Taxes.  All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any taxing jurisdiction, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs with respect to the Transfer of the Company Shares will be split equally between the Purchaser and the Shareholder.  The Purchaser will file all necessary Tax Returns and other documentation in connection with the Taxes and charges encompassed in this Section 5.2(F), and the costs and expenses of filing such Tax Returns and other documentation shall be split equally between the Purchaser and the Shareholder.

G.    Cooperation on Tax Matters.  The Purchaser, the Company and the Shareholder shall cooperate (and cause their respective Affiliates to cooperate) fully, as and to the extent reasonably requested by the other parties, in connection with the preparation and filing of Tax Returns pursuant to this Section 5.2 and any Tax audit, litigation or other proceeding with respect to Taxes and payments in respect thereof.  Such cooperation shall include the retention and (upon the other parties' request) the provision of records and information which are reasonably relevant to any such Tax audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Company and the Shareholder agree to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the

extent notified by the Purchaser, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority. The parties shall provide timely notice to the other in writing of any pending or proposed Tax audits or assessments with respect to Taxes for which the other may have an indemnification obligation under this Agreement. The Purchaser and the Shareholder further agree, upon the reasonable request of the other party, to cooperate with each other to obtain any certificate or other document from any Governmental Entity or otherwise to mitigate, reduce or eliminate any Tax that might otherwise be imposed on either party or the Company in the absence of such certificate or other documentation (including without limitation as a result of the transactions contemplated hereby). Any failure to timely notify the other party of any Tax audits or assessments shall not relieve such party from any obligation hereunder unless (and then only to the extent) such party is actually prejudiced thereby. The parties shall furnish the other with copies of all relevant correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any Taxes for which the other may have an indemnification obligation under this Agreement. The Purchaser and the Shareholder further agree, upon request, to provide the other party with all information that either party may be required to report pursuant to Sections 6043 and 6043A of the Code and all Treasury Regulations promulgated thereunder. The parties agree to cooperate in pursuing a process where they would request the IRS to grant relief to Flirt, Inc. to allow Flirt, Inc. to become an S corporation for its year ended December 31, 2004, provided that any additional costs and expenses of such process (on a net basis, taking into account all of the consequences of such an S election), including the tax costs of Flirt becoming an S corporation for such year, would be borne by the Purchaser.

       I.     <u>Purchase Price Adjustment</u>. All indemnification payments under this Section 5.2 and Section 6.15 shall be deemed adjustments to the Purchase Price.

       J.     <u>Certain Definitions</u>. For purposes of this Agreement: (i) "<u>Tax</u>" or "<u>Taxes</u>" means all federal, state, provincial, territorial, local, foreign and other taxes, assessments, or governmental charges in each case in the nature of a tax, including income, capital, franchise, capital stock, excise, property, sales, use, service, service use, leasing, leasing use, license, goods and services, gross receipts, value added, single business, alternative or add-on minimum, occupation, real and personal property, stamp, ad valorem, workers' compensation, severance, profits, windfall profits, customs, duties, disability, registration, estimated, environmental (including Taxes under Code Section 59A), transfer, payroll, wage or other withholding, employment, unemployment, social security (or similar) taxes or premiums, or other assessments, charges and taxes of the same or similar nature, together with any interest, penalties or additions thereon and estimated payments thereof, whether disputed or not; and (ii) "<u>Tax Return</u>" or "<u>Tax Returns</u>" includes all returns, reports, information returns, forms, declarations, claims for refund, statements and other documents (including any amendments thereto and including any schedule or attachment thereto) in connection with Taxes that are required to be filed with a Governmental Entity or other tax authority, or sent or provided to another party under applicable Law (including any schedule or attachment thereto and including any amendment thereof), and all citations of the Code or to the Treasury Regulations promulgated thereunder will include any amendments or successor provisions thereto.

-23-

Section 5.3    Books and Records.  Until the earlier of (i) the expiration of the applicable statute of limitations (including periods of waiver) or (ii) seven (7) years after the Closing Date (or such longer period as may be required by any Law or any ongoing Legal Proceeding), (1) the Purchaser shall cause the Company to maintain all books and records of the Company material to the Business; and (2) the Shareholder shall maintain those books and records which are material to the Business and are not provided to Purchaser at or in connection with the Closing; in each case with respect to the period up to and including the Closing; and (3) the Purchaser and the Shareholder, respectively, shall permit the Shareholder and the Purchaser, respectively, to have reasonable access to such books, records and data for inspection and copying by the Shareholder or Purchaser, respectively, or their respective duly authorized representatives (at the Shareholder's or Purchaser's respective expense) upon reasonable prior written notice, in connection with the preparation of financial reports, Tax Returns, Tax audits, the defense or prosecution of litigation, or any other reasonable need of the Shareholder or Purchaser, respectively, to consult such records and data.

Section 5.4    Discharge of Liabilities.  The Purchaser acknowledges that any and all Liabilities of the Company at Closing shall continue to be Liabilities of the Company unaffected by the Closing and the Transfer of the Company Shares hereunder.

Section 5.6    Indemnification of Directors and Officers.  Following the Closing, the Purchaser shall cause the Company to honor its obligations, if any, to indemnify and advance defense costs to each present and former officer or director of the Company pursuant to its Charter Documents and shall not permit the Charter Documents of the Company to be amended for a period of six years in a manner which materially adversely affects the indemnification rights, if any, of present and former directors and officers of the Company.

Section 5.7    Further Assurances.  At any time and from time to time, the Shareholder on the one hand, and the Purchaser, on the other hand, shall promptly execute, acknowledge and deliver any other assurances or documents reasonably requested by the other, as the case may be, and necessary for it, as the case may be, to satisfy its respective obligations hereunder or obtain the benefits contemplated hereby.

Section 5.8    Confidentiality.  In consideration of the mutual covenants contained herein, Shareholder agrees that, for all times after the Closing, except as required by law or court order, or in order to assert a claim or defense under this Agreement or the Additional Transaction Documents, he shall not, directly or indirectly, disclose to any unauthorized Person or use for his own account (other than pursuant to his employment duties under the Employment Agreement) any Confidential Information.

Section 5.9    Non-Competition; Non-Solicitation.

(i)    Shareholder acknowledges that during his employment relationship with, and through his involvement as a stockholder of, the Company, Shareholder has become familiar with trade secrets and other Confidential Information concerning the Company, and with investment opportunities relating to their respective businesses.  Therefore, Shareholder agrees that for a period of five years following the date hereof (the "NonCompete Period"), he will not

-24-

singly, jointly, or as a partner, member or stockholder directly, indirectly or beneficially own, manage, control, participate in the ownership, management, operation or control of, or render services for (as a consultant or advisor), or provide financial assistance to a Competitive Business. Nothing in this Section will prohibit Shareholder from: (a) being employed by the Company or its Affiliates; or (b) being a passive owner of less than 5% of the outstanding stock of any company listed on a national securities exchange or actively traded in the over-the-counter market, so long as Shareholder has no direct or indirect participation in the management of such company.

(ii)     During the NonCompete Period, Shareholder shall not (i) directly or indirectly, either for himself or for any other person, business, partnership, association, firm, company or corporation, hire from the Company, or attempt to hire, divert or take away from the Company, any of the officers or employees of the Company in existence from time to time during his employment with the Company, (ii) interfere with or attempt to interfere with, the relationship of the Company or its Affiliates, with any employee, customer or supplier of the Company or its Affiliates, or (iii) knowingly make any public statement or other public communication (or repeated and widespread private statements or communications) that is or are reasonably likely to materially damage the goodwill of the Company or its Affiliates, or knowingly take any action, directly or indirectly, to interfere with any contractual or customer or supplier relationships of the Company or its Affiliates.

(iii)     Shareholder agrees and acknowledges that:  (a) the covenants set forth in this Section 5.9 are reasonably limited in time and in all other respects, (b) the covenants set forth in this Section 5.9 are reasonably necessary for the protection of the Company, (c) the Purchaser would not have entered into this Agreement but for the covenants of the Shareholder contained herein, and (d) the covenants contained herein have been made in order to induce the Purchaser to enter into this Agreement.

(iv)     If, at the time of enforcement of this Section 5.9, a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under the circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

(v)     The Shareholder recognizes and affirms that in the event of his breach of any provision of this Section 5.9, money damages would be inadequate and the Purchaser and the Company would have no adequate remedy at law.  Accordingly, the Shareholder agrees that in the event of a breach or a threatened breach by the Shareholder of any of the provisions of this Section 5.9, the Purchaser and the Company, in addition and supplementary to other rights and remedies existing in their favor, may apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

Section 5.10  Guarantees.  To the extent that the Shareholder or Stacey Manganella has personally guaranteed any obligations of the Company under any Commitment, then from and

after the Closing (1) at the Shareholder's request the Purchaser will use reasonable efforts to have the Shareholder and/or Stacey Manganella removed from such guarantee; (2) the Purchaser shall not allow the Company to amend, extend or renew such Commitment without removing the Shareholder and Stacey Manganella from such guarantee; and (3) the Purchaser shall indemnify the Shareholder and Stacey Manganella from any and all Shareholder's Losses (as defined in Section 6.15(B)) incurred or suffered by the Shareholder and/or Stacey Manganella on account of such guarantee.

## ARTICLE VI

### Miscellaneous

Section 6.1    Entire Agreement.  This Agreement (including the Disclosure Schedule and the Additional Transaction Documents) supersedes any other agreement, whether written or oral, that may have been made or entered into by any party or any of their respective Affiliates (or by any director, officer or representative thereof) with respect to the subject matter hereof. This Agreement (including the Disclosure Schedule and the Additional Transaction Documents) constitutes the entire agreement of the parties hereto with respect to the matters provided for herein, and there are no agreements or commitments by or among such parties or their Affiliates with respect to the subject matter hereof except as expressly set forth in this Agreement, the Disclosure Schedule and the Additional Transaction Documents.

Section 6.2    Amendments.  No amendment, modification or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the Purchaser and the Shareholder.

Section 6.3    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  This Agreement may not be assigned by any party without the prior written consent of the other parties; provided, however, that Purchaser may assign any or all of its rights and obligations under this Agreement or the Additional Transaction Documents to any direct or indirect wholly owned subsidiary, limited partnership, limited liability company or similar business entity without the consent of the Shareholder, or to any Person in connection with the sale or transfer to such Person of all or substantially all of the Purchaser's assets, or as a collateral assignment by the Purchaser to its lenders; but such assignment shall not relieve the Purchaser of any of its obligations hereunder.

Section 6.4    Counterparts.  This Agreement may be executed and delivered in counterparts, each of which when executed and delivered shall be deemed to be an original for all purposes and all of which together shall constitute one and the same agreement.

Section 6.5    Headings and Section References.  The headings of the sections and paragraphs of this Agreement are for reference purposes only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.  All Article and Section references herein, unless otherwise clearly indicated, are to Articles and sections within this Agreement.

Section 6.6    Waiver. No failure or delay by either the Purchaser or the Shareholder in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

Section 6.7    Expenses. Except as otherwise specifically provided for in this Agreement or in any Additional Transaction Document, the Shareholder and the Purchaser shall each pay all costs and expenses incurred by such party or on such party's behalf in connection with this Agreement and the Contemplated Transactions, including fees and expenses of such party's own financial consultants, accountants and counsel.

Section 6.8    Notices. Any notice, request, instruction or other document or communication to be given under this Agreement by any party hereto to any other party shall be in writing and delivered personally or sent by an internationally recognized overnight courier service or by registered or certified mail, postage prepaid:

If to the Shareholder to the following address:

> c/o Jasmine Company, Inc
> 329 Newbury Street
> Boston MA 02115
> Attn: Luciano Manganella

with a copy to:

> Goulston & Storrs, P.C.
> 400 Atlantic Avenue
> Boston, MA  02110-3333
> Attn:   Matthew E. Epstein, Esq.

If to the Purchaser, or to the Company following the Closing, to:

> New York & Company, Inc.
> 450 West 33rd Street
> New York, NY  10001
> Attn:   Ronald W. Ristau

with a copy to:

> Kirkland & Ellis LLP
> Citigroup Center
> 153 East 53rd Street
> New York, NY  10022-46 4611
> Attn:   Michael T Edsall
>          Heidi C. Matterfis

or at such other address for a party or as shall be specified by like notice. Any notice that is delivered personally in the manner provided herein shall be deemed to have been duly given to the Person to which it is directed upon actual receipt by such party (or its agent for notices hereunder). Any notice that is addressed as provided herein and mailed by registered or certified mail shall be conclusively presumed to have been duly given to the Person to which it is addressed at the close of business, local time of such party, on the fifth calendar day after the day it is so placed in the mail. Any notice that is addressed as provided herein and sent by an internationally recognized overnight courier service shall be conclusively presumed to have been duly given to the Person to which it is addressed at the close of business, local time of such Person, on the next business day following its deposit with such courier service for next day delivery.

Section 6.9    Governing Law. This Agreement and the legal relations among the parties hereto shall be governed and construed in accordance with the substantive Laws of the State of New York without giving effect to the principles of conflict of laws thereof.

Section 6.10    Severability. If any provisions hereof shall be held by any court of competent jurisdiction to be prohibited by, illegal or unenforceable, such provisions shall be of no force and effect to the extent of such prohibition, illegality or unenforceability, but the prohibition, illegality or unenforceability shall have no effect upon, and shall not impair the enforceability of, any other provision of this Agreement.

Section 6.11    Knowledge. Whenever "to its knowledge," "known," "aware," "awareness," or a similar phrase is used with respect to the Shareholder to qualify a representation or warranty of the Shareholder the "knowledge" or "awareness" so referred to shall be deemed to be the actual and conscious (and not constructive) knowledge of the Shareholder and Stacey Manganella, along with the knowledge that the Shareholder would reasonably be expected to have as the result of such person's position as chief executive officer and sole stockholder, and Key Employee, respectively of the Company.

Section 6.12    Rights of Third Parties. Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give any Person other than the parties hereto and their respective successors and permitted assigns any rights, benefits or remedies under or by reason of this Agreement or any transaction contemplated hereby except for the Parties entitled to indemnification under Section 6.15.

Section 6.13    Consent to Jurisdiction and Service of Process. The Purchaser and each of the Shareholder hereby irrevocably consents that any legal action or proceeding against it under, arising out of, or in any manner relating to this Agreement or any other agreement, document or instrument arising out of or executed in connection with this Agreement shall be brought only in a state or federal court of competent jurisdiction located within the State of New York and in all appellate courts associated therewith. Each party by the execution and delivery of this Agreement expressly and irrevocably consents and submits to the personal jurisdiction of any of such courts in any such action or proceeding. Each party hereby expressly and irrevocably waives any claim or defense in any action or proceeding based on any alleged lack of personal

jurisdiction, improper venue, forum non conveniens, or any similar basis. Notwithstanding the foregoing, the Purchaser may elect, in its sole discretion, to initiate the arbitration procedures set forth on <u>Schedule 6.13</u> to assert a claim that a Major Employment Breach has occurred and to enforce its rights with respect to the same pursuant to Section 6.16. In such election, the parties shall cooperate in good faith to implement such arbitration in accordance with Schedule 6.13, and, without limiting the foregoing, the parties shall direct the arbitrators in such event to issue their determinations on an expedited basis.

Section 6.14 <u>Waiver of Right to Jury Trial</u>. The Company, the Purchaser and the Shareholder hereby waive, to the extent permitted by applicable law, trial by jury in any litigation in any court with respect to, in connection with, or arising out of this Agreement, any other Agreement contemplated hereby or thereby or the validity, protection, interpretation, collection or enforcement thereof.

Section 6.15 <u>Indemnification; Survival of Representations and Warranties</u>.

A. <u>Indemnification by Shareholder</u>. The Shareholder shall indemnify, defend and hold harmless the Purchaser and its Affiliates and their respective employees, agents, officers, directors, stockholders, partners, representatives, successors and permitted assigns and the Company (a "<u>Purchaser Indemnified Person</u>") from and against any losses, taxes, penalties, assessments, Liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and disbursements) incurred by such indemnified party as the result of or arising from any misrepresentation in, breach of or failure to comply with, any of the representations, warranties, covenants or agreements of the Shareholder contained in this Agreement or any Additional Transaction Document (including without limitation the covenants with respect to Taxes under Section 5.2 hereof); and all such losses, assessments, Liabilities, claims, damages, costs and expenses are referred to hereinafter as the "<u>Purchaser's Losses</u>."

B. <u>Indemnification by the Purchaser</u>. The Purchaser shall indemnify, defend and hold harmless the Shareholder and its Affiliates and their respective employees, officers, directors, stockholders, partners, agents, representatives, successors and permitted assigns (a "<u>Shareholder Indemnified Party</u>") from and against any losses, taxes, penalties, assessments, Liabilities, claims, damages, costs and expenses (including reasonable attorneys' fees and disbursements) incurred by such indemnified party as the result of or arising from any misrepresentation in, breach of or failure to comply with, any of the representations, warranties, covenants or agreements of the Purchaser contained in this Agreement or any Additional Transaction Document (including without limitation the covenants with respect to Taxes under Section 5.2 hereof); and all such losses, assessments, Liabilities, claims, damages, costs and expenses are referred to hereinafter as the "<u>Shareholder's Losses</u>."

C. <u>Survival; Limitations</u>. Notwithstanding anything else in this Agreement or any Additional Transaction Document to the contrary:

(i) The representations and warranties of the Shareholder and the Purchaser, respectively, under this Agreement and any Additional Transaction Document, and any indemnification obligations arising therefrom, shall survive the Closing and shall expire and

-29-

terminate on the date which is 12 months following the Closing Date; *provided, however,* that the Shareholder's representations and warranties in Section 3.1(A)(iii), Section 3.1(A)(iv), Section 3.1(K)(3), Section 3.1(N), and Section 3.1(O), and Section 3.1(S) shall not so expire and terminate upon such date but rather shall expire and terminate 60 days following the expiration of the respective statutes of limitations applicable to the matters giving rise to a claim for breach of such sections (such applicable date, the "Survival Date"). The covenants of the parties under this Agreement and under any Additional Transaction Document, and any indemnification obligations arising therefrom, shall survive the Closing and shall expire in accordance with their terms. Any claim for indemnification made by a Purchaser Indemnified Party or a Shareholder Indemnified Party under this Section 6.15 must be raised in a writing delivered to the Shareholder or the Purchaser, as applicable, by no later than the Survival Date and, if raised by such date, such claim shall survive the Survival Date until final resolution thereof.

(ii)     The Shareholder shall not have any indemnification obligations under Section 6.15(A), and the Purchaser shall not have any indemnification obligations under Section 6.15(B): (a) except to the extent that the Purchaser's Losses, or the Shareholder's Losses, respectively, with respect to all such Material Claims in the aggregate exceed $300,000 (the "Indemnification Threshold"), in which event such indemnification shall be required only to the full extent of the Purchaser's Losses or the Shareholder's Losses, respectively, in excess of the Indemnification Threshold (subject also to the succeeding clause (b) of this Section 6.15(C)(ii)); and (b) to the extent that the Purchaser's Losses in the aggregate, or the Shareholder's Losses in the aggregate, respectively, exceed $4,500,000 (the "Cap"), in which event such indemnification shall be required only to the extent of the Purchaser's Losses or the Shareholder's Losses, respectively, below the Cap (subject also to the preceding clauses (a) and (b) of this Section 6.15(C)(ii)), *provided that* this Section 6.15(C)(ii) shall not apply to the covenants of the parties and the indemnification obligations relating thereto or to the Seller's representations and warranties set forth in Section 3.1(A)(iii), Section 3.1(A)(iv), Section 3.1(K)(3), Section 3.1(N), and Section 3.1(O), and Section 3.1(S), *provided further however* that in no event shall the foregoing proviso result in the Shareholder's maximum liability under this Agreement or the Additional Transaction Documents being more than the Purchase Price.

(iii)     With respect to any matter for which indemnification has been provided hereunder, the Indemnitee (as defined below) hereby covenants and agrees to use all commercially reasonable efforts to collect amounts payable to the Indemnitee under any applicable insurance policy of the Indemnitee, and any such amounts so paid to the Indemnitee shall reduce the indemnification obligations of the Indemnitor (as defined below) with respect to such matters; provided that this provision shall not limit Indemnitee's right to pursue indemnification hereunder.

(iv)     In no event shall Shareholder's Losses or Purchaser's Losses, as the case may be, include amounts arising from special, exemplary, or punitive damages.

(v)     The Shareholder shall have no liability under this Agreement (including under Section 3.1(N), Section 5.2 and Section 6.15(A)) in relation to any Liability or matter to the extent that the amount of such matter or Liability was included in the determination of the

GSDOCS\10125:0001\1508464 5-A VER0465 7/19/2005 4:34 PM

Final Adjustment.

(v)    In no event shall an Indemnitee have, with respect to Purchaser's Losses, any recourse to the Escrow Assets or the Escrow Account, and the Purchaser hereby waives, for itself and on behalf of each Indemnitee having claims with respect to Purchaser's Losses, any recourse to, or claims or rights with respect to, the Escrow Assets and the Escrow Account, provided, however, that such waiver shall not apply to such Purchaser's Losses to the extent arising from a Major Employment Breach by the Shareholder, and provided further that such waiver shall expire, and be of no further force or effect, from and after July 31, 2006; and provided further that such waiver shall not apply to any other assets, rights or properties of the Shareholder. As used above, the term "Escrow Assets" means any and all cash, stock, property and assets held in escrow pursuant to the Escrow Agreement (or any replacement escrow agreement) pursuant to Section 1.4, and the term Escrow Account means the account or accounts maintained by the escrow agent and containing the Escrow Assets.

(vi)    The parties acknowledge that the limitations set forth in the preceding clauses (i), (ii), (iii), (iv), (v) and (vi) of this Section 6.15(C) are not mutually exclusive, but rather are separate and independent limitations, and that each and all such limitations may, alone or together, apply to a party's indemnification obligations in accordance with their respective terms.

D.    <u>Sole Remedy</u>. Notwithstanding anything herein to the contrary, each party's sole and exclusive remedy against any other party for any breach of a representation, warranty, covenant or other obligation made in or imposed by this Agreement or any Additional Transaction Document or the other transactions contemplated hereunder or under the Additional Transaction Documents shall be a claim for indemnification under this Section 6.15, subject to all of the limitations of this Section 6.15, including under Section 6.15(C), except in the case of claims in the event of a Major Employment Breach under Section 6.16, or claims in the event of a Major Lease Termination under Section 7.17, or claims for fraud or for equitable remedies, *provided that* any breach of any representation, warranty, covenant or agreement by a party hereunder shall not, in and of itself, constitute "fraud" by such party.

E.    <u>Procedures</u>.

(i)    In the event that any Legal Proceeding shall be instituted with respect to which indemnification may be sought by one party hereto from another party under the provisions of this Section 6.15, the party seeking indemnification ("<u>Indemnitee</u>") shall, promptly after acquiring knowledge of such Legal Proceeding, cause written notice in reasonable detail of such Legal Proceeding which is covered by this indemnification to be forwarded to the other party from which indemnification is being sought ("<u>Indemnitor</u>"), provided, however, the failure to notify the Indemnitor will not relieve the Indemnitor of any liability it may have to indemnify the Indemnitee except to the extent that the Indemnitor's defense of such action, or any of the Indemnitor's rights with respect to the same, including any rights under insurance or against any third parties, is actually prejudiced or impaired by the Indemnitee's failure to give such notice.

(ii)    In the event of the initiation of any such Legal Proceeding against an Indemnitee, the Indemnitor, after the receipt of the notice described in Section 6.15(E)(i), at its option and at its own expense, to be represented by counsel of its choice, and reasonably acceptable to Indemnitee, and (subject to Section 6.15(E)(iii) and the second provision of this subsection) to defend against, negotiate, settle or otherwise deal with any Legal Proceeding or demand that relates to any Purchaser's Losses or Shareholder's Losses, as the case may be, indemnified against hereunder, and, in such event, the Indemnitee will reasonably cooperate with the Indemnitor and its representatives in connection with such defense, negotiation, settlement or dealings; *provided, however*, that the Indemnitee may directly participate in any such Legal Proceeding so defended with counsel of its choice at its own expense; *provided further* that the Indemnitor shall not be entitled to assume control of such defense and shall pay the fees and expenses of counsel retained by the Indemnitee (reasonably acceptable to Indemnitor) if (1) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation; (2 the claim seeks an injunction or equitable relief against the Indemnitee; (3) a conflict of interest exists between the Indemnitor and the Indemnitee; or (4) the Indemnitor failed or is failing to vigorously prosecute or defend such claim). Additionally, if the claim for Indemnification relates to Taxes, the Indemnitor's rights to control the defense of such matter shall extend only to the specific issue for which indemnification is claimed (and not the entire return or taxable period).

(iii)    If the Indemnitor shall control the defense of such claim, the Indemnitor shall obtain the prior written consent of the Indemnitee before entering into any settlement of any third party claim which would lead to Liability or create any financial or other obligation on the part of the Indemnitee which is not paid or reimbursed in full by the Indemnitor on account of its indemnification obligation hereunder; and Indemnitee may refuse to consent to a settlement which imposes continuing obligations on Indemnitee or involves any non-monetary relief, does not result in a complete release of Indemnitee from any and all liability (excluding any liability with respect to which the Indemnitor acknowledges its indemnification obligations) or involves a finding or admission of any violation of Legal Requirements or any violation of the rights of any Person by Indemnitee. If a firm offer is made to settle a third party claim without leading to Liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnitor desires to accept and agree to such offer, the Indemnitor will give written notice to the Indemnitee to that effect. If the Indemnitee notifies the Indemnitor that it does not consent to such firm offer within ten (10) Business Days after its receipt of such notice from the Indemnitor, the Indemnitee may continue to contest or defend such third party claim and, in such event, the maximum Liability of the Indemnitor as to such third party claim will not exceed the amount of such settlement offer, plus the Purchaser's Losses or Shareholder's Losses, as the case may be, reasonably paid or incurred by the Indemnitee through the end of such 10-Business Day period.

(iv)    After any final judgment or award shall have been rendered by a Governmental Entity of competent jurisdiction, and the time in which to appeal therefrom has expired, or a settlement shall have been consummated, or the Indemnitee and the Indemnitor shall have arrived at a mutually binding agreement with respect to each separate matter alleged to be indemnified against by the Indemnitor hereunder, the Indemnitee shall forward to the Indemnitor notice of any sums due and owing with respect to such matter, and the Indemnitor shall pay all of

the sums so owing to the Indemnitee by wire transfer or certified or bank cashier's check within thirty (30) days after the date of such notice. Any indemnification obligations of the (A) Shareholder shall be shall be paid by wire transfer of immediately available funds to an account designated in writing by the applicable Purchaser Indemnified Party within 10 days after the determination thereof (B) Purchaser shall be paid by wire transfer of immediately available funds to an account designated in writing by the applicable Shareholder Indemnified Party within 10 days after the determination thereof.

Section 6.16    <u>Major Employment Breach</u>.

A.    In the event that a Major Employment Breach occurs, Shareholder shall pay to Purchaser an amount of cash equal to $7,000,000 (plus interest, calculated at the Interest Rate) (the "<u>Shareholder Payment</u>"). The parties agree that the $7,000,000 is being deposited into escrow under Section 1.4 as security for Shareholder's obligation to make such Shareholder Payment. The parties recognize that in the event of a Major Employment Breach, the actual damages to the Purchaser would be extremely difficult or impossible to determine, and that the amount of $7,000,000 represents the parties' reasonable estimate of such damages, and that such amount shall constitute liquidated damages payable to the Purchaser. Shareholder shall pay such amount to Purchaser out of the Escrow Amount; provided that if the Escrow Amount has been distributed to Shareholder or its designee pursuant to the terms of the Escrow Agreement or if the Escrow Amount is less than the Shareholder Payment, the Shareholder shall pay the full amount or such remaining portion of the Shareholder Payment, as applicable, to Purchaser by wire transfer of immediately available funds to an account designated in writing by Purchaser within 10 days after the determination thereof. The Shareholder Payment shall constitute a full and complete release and discharge of Shareholder's liability with respect to such Major Employment Breach.

B.    In the event of a dispute as to whether a Major Employment Breach has occurred, Shareholder and Purchaser shall cooperate in good faith to resolve such dispute. If an arbitration proceeding is commenced, Purchase and Shareholder shall comply with the arbitration procedures set forth on Schedule 6.13 and shall instruct the Arbitration Panel to render a final determination with respect to such dispute within 30 days following the selection of the Arbitration Panel.

C.    Notwithstanding anything to the contrary set forth herein, in the event of a dispute as to whether there has been a Major Employment Breach, Purchaser may elect to commence an action in any court of competent jurisdiction to resolve such dispute and may pursue any equitable relief, including but not limited to, obtaining an injunction or temporary restraining order prohibiting the distribution of the Escrow Amount.

D.    Any Shareholder Payment made hereunder shall constitute an adjustment to the Purchase Price.

E.    As used above, the term "<u>Major Employment Breach</u>" means the breach by the Shareholder of his Employment Agreement, provided such breach arises from either (I) the voluntary resignation by the Shareholder of employment with the Company; (II) the willful refusal of the Shareholder to comply with any significant, lawful and proper policy, directive or decision of the Company's Board of Directors or the Chief Executive Officer of the Issuer in

furtherance of a legitimate business purpose or willful refusal to perform the duties reasonably assigned to the Shareholder by the Company's Board of Directors or the Chief Executive Officer of the Issuer and, in each case, only if not remedied within thirty days after receipt of written notice from the Company; or (III) the Shareholder's commission or conviction of, or a plea of guilty or no contest or similar plea with respect to, a felony, an act of fraud or embezzlement in each case against the Company; provided that in no event shall any breach be considered a Major Employment Breach to the extent arising from the death or disability of the Shareholder, and provided further that in no event shall a voluntary resignation by the Shareholder be considered a Major Employment Breach if such resignation is in response to: (1) a material breach by the Company of the Employment Agreement only if not remedied within thirty days after receipt of written notice from the Shareholder, or (2) the request by the Company to engage in (or refrain from reporting to the appropriate authorities) any conduct or activities which are not lawful only if not remedied within thirty days after receipt of written notice from the Shareholder.

    Section 6.17    <u>Major Lease Termination</u>. In the event that a Major Lease Termination occurs, Shareholder shall pay to Purchaser the Major Lease Termination Payment. The parties recognize that in the event of a Major Lease Termination, the actual damages to the Purchaser would be extremely difficult or impossible to determine, and that the amount of the Major Lease Termination Payment represents the parties' reasonable estimate of such damages, and that such amount shall constitute liquidated damages payable to the Purchaser. In the event of a Major Lease Termination, Shareholder shall pay the full amount of the Major Lease Termination Payment by wire transfer of immediately available funds to an account designated in writing by Purchaser within 10 days after the Purchaser's demand thereof. The Major Lease Termination Payment shall constitute a full and complete release and discharge of Shareholder's liability with respect to such Major Lease Termination. As used above, the term "Major Lease Termination" means the Company has lost effective use of its Brattle Street store as the result of eviction or other legal proceedings brought by the landlord under the leases of such store (the "Brattle Street Leases") solely on account of the failure of the Company to get such landlord's consent with respect to the Contemplated Transactions, provided such loss of use has occurred within one year of the Closing Date, and provided the Shareholder has the opportunity, during such one year period only, to control the defense, at his sole cost and expense, of any such eviction or other legal proceeding; and the term "Major Lease Termination Payment" means $2,000,000. In connection with the foregoing, the parties shall work together in good faith to obtain any such consent post-Closing, provided that in no event shall the Purchaser be obligated to make any payments to the landlord under such Brattle Street Leases in order to obtain such consent. Any Major Lease Termination Payment made hereunder shall constitute an adjustment to the Purchase Price.

    Section 6.18.    <u>Certain Definitions and Interpretative Matters</u>

    A.        <u>Definitions</u>. As used herein, the following terms have the meanings set forth as follows:

        (i)        "<u>Adjustment Time</u>" means 12:01 a.m., New York time, on the date of the Closing.

(ii)  "Affiliate" means, with respect to any Person, any other Person controlling, controlled by, or under common control with, such first Person or any individual related by blood, marriage or adoption to any such Person.

(iii)  "Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law) of which the Company is or has been a member.

(iv)  "Assets" means the properties and assets of the Company which are used in the Business.

(v)  "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized by law to close.

(vi)  "Charter Documents" means in the case of the Company and the Purchaser, the current articles of organization or certificate of incorporation, as the case may be, and the bylaws of such entity.

(vii)  "Company Indebtedness" means, without duplication, (A) all indebtedness of the Company for borrowed money (including all principal, interest, premiums, penalties, and breakage fees), (B) all obligations of the Company evidenced by notes, bonds, debentures or similar instruments or pursuant to any guaranty of indebtedness (excluding, in any event, the amounts covered in clause (A) and trade payables), and (C) obligations under capital leases or for deferred purchase price of property or services.

(viii)  "Confidential Information" means the information, observations and data of the Company concerning the business or affairs of the Company (including the Company's technology, computer programs, know-how, designs, inventions, methods of doing business and supplier and customer information): (i) which is proprietary to the Company, (ii) the disclosure of which could reasonably be expected to be detrimental or adverse to the Company, or (iii) is the property of the Company and that the continued success of the Company depends in large part on keeping this information from becoming known to competitors of the Company; provided, however, that Confidential Information shall not include, in any event, any of the foregoing to the extent (A) generally known to the public other than through disclosure by the Shareholder, (B) received by the Shareholder from a third party where the Shareholder had no reasonable reason to conclude that such disclosure was in violation of a duty of confidentiality owed by such third party to the Purchaser; or (C) developed independently of and without reliance on Confidential Information.

(ix)  "Disclosure Schedule" means the Disclosure Schedule attached hereto, which Disclosure Schedule is incorporated herein and made a part hereof, fully as if the same were herein set forth in its entirety.

(x)  "GAAP" means United States generally accepted accounting principles consistently applied with prior periods.

(xi)    "Governmental Entity" means any domestic, foreign, or multinational court, government, governmental agency, arbitrator, authority, entity or instrumentality.

(xii)    "Intellectual Property" means (1) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (2) all trademarks, service marks, trade dress, logos, slogans, designs, trade names, and Internet domain names, together with all translations, adaptations, derivations, and combinations of any of the foregoing, all applications, registrations, and renewals in connection therewith, and including all goodwill associated with any of the foregoing (collectively, "Marks"); (3) all copyrights and works of authorship, and all applications, registrations, and renewals in connection therewith; (4) all trade secrets and confidential business information (including ideas, know-how, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (5) all computer software (including source code, executable code, data, databases, and related documentation); (6) all other proprietary and intellectual property rights, and (7) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

(xiii)    "Laws" means any foreign or domestic, federal, state, provincial, territorial, county or local constitution, statute, law, principle of common law, ordinance, rule, regulation, treaty or court or administrative order, decree, judgment or ruling.

(xiv)    "Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments or modifications thereto, pursuant to which the Company occupies any Leased Realty.

(xv)    "Legal Proceeding" means any claim, action, suit, proceeding or investigation before any Governmental Entity, whether brought, initiated, asserted or maintained by a Governmental Entity or any other Person.

(xvi)    "Liabilities" means all liabilities, claims, obligations, expenses or damages, whether known or unknown, fixed or contingent.

(xvii)    "Material Adverse Effect" means a material adverse effect on the business, assets, operations, financial condition or cashflow of the Company or the Business, taken as whole, excluding any such effect resulting from the Contemplated Transactions or relating to general economic conditions.

(xxi)    "Person" means any individual, person, corporation, trust, partnership, limited liability company, unincorporated association, joint venture, Governmental Entity or other entity of any kind.

(xviii)    "Subsidiary" when used with respect to the Company, means any corporation or other Person (other than a natural person) of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or

similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Company or one or more of its Subsidiaries.

       B.    <u>Certain Interpretive Matters</u>.  Unless the context otherwise requires, (i) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (ii) "or" is disjunctive but not necessarily exclusive, (iii) all words used in this Agreement will be construed to be of such gender or number as the circumstances require, (iv) unless otherwise expressly provided, the word "including" does not limit the preceding words or terms and shall mean "including without limitation," (v) the words "herein," "hereunder" and words of similar import shall refer to this Agreement, (vi) all references to $ or dollar amounts mean lawful currency of the United States of America.  No provision of this Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

       C.    <u>Disclosure Schedules</u>.  The disclosure of any matter in any Disclosure Schedule shall also qualify the representations and warranties contained in Sections of this Agreement other than the Section to which such Schedule specifically relates only to the extent that the language of the disclosure should reasonably apply as the disclosure in such other Section or there is a cross-reference to such other Section (or to the Schedule specifically relating to such other Section).  The disclosure of any matter in any schedule shall expressly not be deemed to constitute an admission by the Shareholder, or to otherwise imply, that any such matter is material for the purposes of this Agreement or that any other schedule (or set of schedules) is incomplete by virtue of the omission of such disclosure.

[Signatures Begin on Next Page]

GSDOCS\10125:0001\1508464 5-AVER0465 7/19/2005 4:34 PM

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first written above.

PURCHASER:

LERNER NEW YORK, INC.

By:
Its:

SHAREHOLDER:

LUCIANO MANGANELLA

# EXHIBIT  C

## AMENDED AND RESTATED ESCROW AGREEMENT

THIS AMENDED AND RESTATED ESCROW AGREEMENT (the "Agreement") is made as of February 28, 2006 by and among Lerner New York, Inc., a Delaware corporation (the "Purchaser"), Luciano Manganella, a Massachusetts resident (the "Shareholder"), and Goulston & Storrs, P.C., a Massachusetts professional corporation, as escrow agent (the "Escrow Agent") and amends and restates in its entirety the Escrow Agreement, dated as of July 19, 2005, by and among the Purchaser, the Shareholder and the Escrow Agent (the "Original Escrow Agreement").

## BACKGROUND

WHEREAS, the Purchaser and the Shareholder entered into that certain Stock Purchase Agreement (the "Purchase Agreement") dated as of July 19, 2005, providing for, among other things, the acquisition by the Purchaser of the Company Shares and the Business (as defined therein);

WHEREAS, pursuant to the Original Escrow Agreement, the Shareholder and the Purchaser agreed to have the Escrow Agent hold in escrow US $7,000,000 (the "Escrowed Funds") pursuant to the terms and conditions of Section 1.4 of the Purchase Agreement;

WHEREAS, the Shareholder and the Purchaser now desire to instruct the Escrow Agent to release one-half (1/2) of the Escrowed Funds, or $3,500,000.00, to the Shareholder upon receipt by the Escrow Agent of stock certificates representing 200,000 shares of common stock, par value $0.01 per share, of New York & Company, Inc., a Delaware corporation (the "Company") owned by Shareholder (the "Escrowed Shares") to be held by the Escrow Agent pursuant to the terms and conditions of Section 1.4 of the Purchase Agreement , and to be disbursed by the Escrow Agent in accordance with this Agreement and the Purchase Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.	The Shareholder and the Purchaser each hereby appoint Goulston & Storrs, P.C. as the escrow agent with respect to the Escrowed Funds and Escrowed Shares in accordance with the terms and conditions of this Escrow Agreement.

2.	Simultaneously with the execution of this Agreement the Shareholder is depositing with the Escrow Agent the Escrowed Shares, together with a stock transfer power in blank, undated and signed by the Shareholder.  Upon receipt of the Escrowed Shares and said stock transfer power, the Escrow Agent is hereby authorized to release to the Shareholder $3,500,000.00 of the Escrowed Funds.  The $3,500,000.00 of funds remaining

in the Escrowed Funds is sometimes hereinafter referred to as the "Remaining Escrowed Funds".

3.    The Escrow Agent shall disburse the Escrowed Shares and the Remaining Escrowed Funds either: (a) to the Shareholder on July 18, 2006; or (b) to the Shareholder or the Purchaser pursuant to a joint written direction duly executed by both such parties and received by the Escrow Agent prior to July 18, 2006; or (c) to the Shareholder or the Purchaser pursuant to a decision ordering such disbursement and issued by the arbitration panel appointed pursuant to the Purchase Agreement (with such order certifying that such panel has been so appointed) (the "Arbitration Panel") or by a court of competent jurisdiction; and upon any such disbursement, this Agreement shall be terminated. Notwithstanding the foregoing, the Escrow Agent will not make any such disbursement of Escrowed Shares or Remaining Escrowed Funds if it is directed not to so pursuant to either: (1) order, binding request, summons or judgment of, or injunction issued by, a court; or (2) an order, judgment or similar determination from the Arbitration Panel (any such direction, a "Disbursement Hold"). If and when cash dividends or proceeds of any sale are paid in respect of any Escrowed Share, the Escrow Agent shall deposit such dividends or proceeds into an interest bearing account designated in writing by the Escrow Agent. Cash dividends or proceeds of any sale that are paid in respect of any Escrowed Shares shall be distributed to the party who ultimately receives the Escrowed Shares and Remaining Escrowed Funds in accordance with this Agreement.

4.    The Escrow Agent, in its sole discretion, may institute legal proceedings of any kind, including, but not limited to, a legal proceeding in any court of competent jurisdiction to determine the obligations of the Purchaser and/or the Shareholder hereunder, and/or whether a Disbursement Hold is valid and complies with this Agreement and the Purchaser Agreement. The Escrow Agent may deposit the Escrowed Shares and Remaining Escrowed Funds in such court, and upon such deposit, the duties of the Escrow Agent hereunder shall be fully terminated and the Escrow Agent shall be fully discharged from all such duties.

5.    The Escrow Agent shall not be responsible for the genuineness of any signature or for the genuineness or collectibility of any check and may rely conclusively and shall be protected in relying upon, and shall have no duty or obligation to investigate or ascertain the correctness or status of, any direction, notice, judgment, order, decree, certificate, request, consent, statement or other instrument delivered to it in connection with its activities hereunder.

6.    In no event shall the Escrow Agent, its officers, agents or employees, be liable for any act performed or omitted to be performed by it hereunder in the absence of willful and wanton misconduct, and in no event shall it be liable or responsible for any failure, for any reason, of the banking institution in which the Escrowed Shares or Remaining Escrowed Funds are held to pay any amount at Escrow Agent's direction. This Agreement sets forth exclusively the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no duties or obligations shall be implied against the Escrow Agent.

7.     The Shareholder and the Purchaser each hereby jointly and severally agrees to indemnify and hold Escrow Agent harmless from any damage, costs, liability or expense (including, but not limited to, legal fees either paid to retained attorneys or representing the fair value of legal services) which Escrow Agent may incur by reason of its acting hereunder, without prejudice to any right which any of the Shareholder and the Purchaser may have to recover from the other for any such damage, cost, liability or expense. Without limiting the generality of the foregoing, in no event shall the Escrow Agent be required to take any action unless and until it has been indemnified to its satisfaction by the party requesting such action.

8.     This Agreement amends and replaces the Original Escrow Agreement in its entirety.

9.     This Agreement and all disputes arising under, in connection with or directly or indirectly related thereto in any way shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflict of laws principles, and venue shall lie exclusively in the state and federal courts located in the Commonwealth of Massachusetts.

10.     All notices, requests, demands and other communications hereunder to the Escrow Agent shall be in writing, and only if sent certified mail, return receipt requested, to: Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, MA 02110 Attn: Alan W. Rottenberg, Esq.

*[signatures follow*

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first set forth above.

**SHAREHOLDER:**

_____
Luciano Manganella

**PURCHASER:**

LERNER NEW YORK, INC.

BY: _____
    Name:
    Title:    Ronald W. Ristau
             Chief Operating Officer &
             Chief Financial Officer

**ESCROW AGENT:**

GOULSTON & STORRS, P.C.

By: _____
    Name: Daniel Avery
    Title: Vice President and Director