# EXHIBIT  D

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
*Catherine Shanks*
*Vice President*
*Christopher Fracassa, Yvonne L. Baglini*
*Assistant Vice Presidents*

April 20, 2007

*950 Warren Avenue, East Providence, RI 02914*
*telephone: 866-293-4053 facsimile: 401-435-6529*
*internet: http://www.adr.org/*

Matthew Solum, Esq.
Kirkland & Ellis LLP
153 East 53rd Street
Citigroup Center
New York, NY 10022

Daniel E. Rosenfeld, Esq.
Kirkpatrick & Lockhart Nicholson Graham LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950

Re: 13 116 Y 01508 06
    Lerner New York, Inc.
    and
    Luciano Manganella

Dear Parties:

By direction of the Arbitrators we herewith transmit to you the duly executed Interim Award in the above matter.

Hard copies will follow via USPS.

As always, please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

Joseph P. Conlon
Case Manager
401 431 4894
conlonj@adr.org

*Supervisor Information: Laura E. VanEtten, 401 431 4787, VanEttenl@adr.org*

Encl.

cc:    John D. Feerick, Esq.
       William L.D. Barrett, Esq.
       Thomas J. Kavaler, Esq.

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

the release from escrow of S7 million, plus attorneys' fees, interest and arbitration costs. The Claimant also filed a Statement of Claim dated June 30, 2006 and subsequently an amended Statement of Claim dated August 25, 2006. Respondent filed responses to these Statements.

At the time this proceeding was commenced, Lerner filed an action in the United States District Court for the District of Massachusetts seeking to enjoin Goulston & Storrs, as escrow agent, from disbursing certain funds to Respondent pending the outcome of this arbitration. By order dated July 12, 2006, the Court (Lasker, J.) granted Lerner's motion for a preliminary injunction.

The Panel was constituted pursuant to the provisions of an arbitration agreement dated July 19, 2005. Each party appointed an arbitrator and the party-appointed arbitrators chose the chair of this Panel. All three arbitrators served in this matter as neutral arbitrators under the rules and ethical standards of the American Arbitration Association ("AAA").

Following the commencement of this Arbitration, the Panel conducted a preliminary conference with counsel for the parties on August 16, 2006, and was called upon prior to the hearing to resolve issues that arose with respect to deposition discovery. The Panel also considered and denied motions by Respondent to dismiss Claimant's major employment breach claim which lies at the core of this proceeding.

The hearing in this matter was held in New York City on November 20, 21, 27, 28, 29 and December 18, 19, 20, 27, and 28, 2006. The Panel received in advance of the hearing from each party a pre-hearing brief. Following the hearing, the Panel received post-hearing briefs and then closings arguments at a six hour session held on February 27, 2007.

At the hearing Claimant offered testimony from Sandra Brooslin Viviano, Executive Vice President of Human Resources of NY&Co.; Ronald W. Ristau, Chief Operating Officer and Chief Financial Officer, NY&Co.; Howard T. Anderson of Stier Anderson, LLC, which conducts internal investigations; Richard Crystal, president, chairman and chief executive officer of NY&Co.; Barbara A. Lee, professor of human resource management at Rutgers University; Meghan Capitula, district manager at Jasmine's Newton Center office; Joan Ruggiero, manager of associate relations at NY&Co.; and three current women employees and a former woman employee of the Jasmine Division of NY&Co. who testified as to sexual misconduct by Mr. Manganella. (For privacy reasons we see no reason to specifically identify these women).

Respondent, Jasmine's former president, testified and he also called as a witness his wife, Stacey Manganella, former executive vice president of merchandising at Jasmine, and Gilbert Casellas, who served as general counsel of the Department of the Air Force and then chairman of the Equal Employment Opportunity Commission and currently practices law.

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

---------------------------------------------------------x

LERNER NEW YORK, INC.,

                            Claimant,   :     Case No. 13-116-Y-01508-06

    and                            :     OPINION AND INTERIM
                                    :     AWARD

LUCIANO MANGANELLA            :     BY ABITRATION PANEL

                                 :     John D. Feerick, Chair
                    Respondent.  :     William L.D. Barrett
                                 :     Thomas J. Kavaler

---------------------------------------------------------x

**Appearances**

      KIRKLAND & ELLIS, LLP
      Attorneys for Claimant
        153 East 53rd Street
        New York, New York 10022-4611
      BY: MATTHEW SOLUM, ESQ.
         CHRIS COULSTON, ESQ.

      KIRKPATRICK & LOCKHART NICHOLSON GRAHAM, LLP
      Attorneys for Respondent
        One Lincoln Street
        Boston, Massachusetts 02111-2950
      BY: DANIEL E. ROSENFELD, ESQ.
         CHRISTINE JOHNSTON, ESQ.
         ROSEMARY ALITO, ESQ.

**We, THE UNDERSIGNED ARBITRATORS,** having been designated in accordance with the arbitration agreement contained in an agreement between the above-named parties dated July 19, 2005, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows

## PRELIMINARY STATEMENT

Claimant Lerner New York, Inc. ("Lerner"), a subsidiary of New York & Company, Inc. ("NY&Co."), commenced this proceeding against Respondent ("Mr. Manganella") by filing with the American Arbitration Association a Demand dated June 29, 2006, seeking

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

## POSITIONS OF PARTIES

The principal issue presented to the Panel is whether Mr. Manganella committed a major employment breach as defined by a certain stock purchase agreement between Lerner and Respondent ("SPA"), dated July 19, 2005, which provides that the term "Major Employment Breach" means the breach by the Shareholder of his Employment Agreement, provided such breach arises from …(ii) the willful refusal of the Shareholder to comply with any significant, lawful and proper policy, directive or decision … if not remedied within thirty days after receipt of written notice from the Company…".

Claimant asserts that Respondent sexually harassed four Jasmine employees; willfully refused to abide by the Code of Conduct of NY&Co.; and that the violation could not be remedied. It states that Respondent's denials are not credible; that Respondent was aware of the Code and policy against sexual harassment, and still willfully refused to comply; that the effects on the women in question cannot be remedied; and that there is no remedy to ensure that Respondent will not harass additional women. As a result, Claimant states that Respondent's refusal was cause to terminate his employment under his employment agreement and a major employment breach under the stock purchase agreement.

Respondent contends that Lerner failed to establish a major employment breach as defined by the parties' stock purchase agreement. He contends that Lerner failed to establish that he willfully refused to comply with a policy, that he received written notice of the alleged willful refusal, and that he failed to remedy the willful refusal after receiving written notice. He disputes that he sexually harassed any of Jasmine's women employees and states that he never received prior to his termination any notice of the specific allegations of misconduct by the women who testified. He also said that Claimant presented no evidence of futility under New York law with respect to notice and remedy.

Respondent also urges that he was constructively terminated by Claimant, in breach of his employment agreement, because (i) he was prevented from exercising the store site selection authority he was promised, (ii) Jasmine's bank account was closed and his check writing capabilities were removed, (iii) his ability to sell his shares of stock in accordance with the Stock Registration Rights Agreement was restricted, and (iv) he was not provided with the necessary paperwork to complete his taxes. Additionally, Respondent argues that he was wrongfully terminated without "Cause" and that his wife was constructively terminated by reason of the difficult and unpleasant working conditions with which she was presented and the reduction in her rank. Both parties request an award in their favor with respect to these issues.

Both parties call to our attention many cases in support of their positions. They agree that in some circumstances New York courts allow a party to terminate a contract immediately without affording the breaching party notice and an opportunity to cure. They both cite Needham v. Candie's, Inc., 2002 U.S. Dist. LEXIS 15144 (SDNY 2002),

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

for this proposition, among other cases.   In that case, Judge Laura Taylor Swain summarized this area of the law as it applied in the employment context, stating:

> "Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." [citations omitted]. "Under New York Law, … where the agreement specifies conditions precedent to the right of cancellation, the conditions must be complied with." [citations omitted]. Parties must adhere to contractually-secured cure provisions regarding contract termination when the cause for the termination is "the very situation to which the cure provision was intended to apply." [citation omitted].
>
> ***
>
> In limited circumstances, New York law permits a party to terminate a contract immediately, without affording the breaching party notice and opportunity to cure. [citation omitted].   Such circumstances include when the nonperforming party either expressly repudiates the parties' contract [citation omitted] or abandons performance thereof [citation omitted], when the misfeasance is incurable [citation omitted], and when the cure is unfeasible [citation omitted].

Corbin on Contracts, cited by the court in In Re Best Film and Video, 46 BR 861, 872-73 (EDNY 1985), states:

> Obviously, not every vital breach will excuse the obligation to follow the contract procedures for termination.   And the present author is not yet prepared to suggest what circumstances will distinguish the two cases.   Courts, using their good sense, will be able to tell breaches which excuse the obligation to give notice from breaches which do not.   It is perhaps enough that they are aware that a distinction must be drawn here.   Corbin on Contracts, 1982, Supplement by Colin K. Kaufman, Part 2, section 1266, at pp 369-370.

Id. at 874-75.

## SUMMARY OF FINDINGS

The parties have presented many issues to the Panel.   Respondent has raised many defenses based on claims of prior breaches of agreements between him and Claimant. The proof in this proceeding does not support any of these defenses.   We also make no

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

finding, one way or another, with respect to Mrs. Manganella's claim of constructive termination. That claim is before another tribunal.

On the claims before us, there is one central issue and that is whether Mr. Manganella committed a major employment breach as defined in the SPA executed on July 19, 2005 at the time he sold his business to NY&Co. If he did, Claimant is entitled to the $7 million part of the purchase price placed in escrow. If he did not commit a major employment breach, Respondent is entitled to that payment.

To establish a major employment breach under the SPA, there must be a willful refusal by Respondent to comply with a significant policy of NY&Co. "and only if not remedied within thirty days after receipt of written notice from the Company." There is no issue concerning whether Respondent received written notice. He did not. At no point before his termination did Claimant provide him, either in writing or orally, with notice of the specific allegations of misconduct with which he was charged.

We find, despite his protestations to the contrary, that Respondent was well acquainted with the Company's policy on sexual harassment and other acts of inappropriate conduct. We find that he did not comply with the policy on sexual harassment and that his refusal was willful. The requirement of willful refusal was satisfied based on the evidence presented to the Panel in this proceeding.

The question then becomes whether, before Respondent can lose a substantial part of the purchase price withheld from the sale of his business, Claimant was obligated to provide him with written notice and a remedial opportunity. We find that he was entitled to such an opportunity, not because Claimant might agree with him on a proposed alternative, but because he was promised an opportunity as part of the bargain leading to the sale of his business.

We can find no reason anchored in public policy that requires a contrary result. Moreover, we note that Claimant could have terminated Respondent under his employment agreement based on other provisions, including possibly even other cause provisions. No principle of immediacy was present at the time of his termination since he had been placed on administrative leave and he could have been continued on such leave if provided with written notice and an opportunity to remedy. To provide an opportunity means only that – an opportunity to be heard and not an opportunity, after being heard, that would prohibit the Company from terminating him even for cause based on a major employment breach.

What makes this proceeding difficult is the reprehensible nature of Respondent's conduct and his lack of forthrightness. He knew better and he owed the women who testified conduct associated with leaders. The women employees who testified in this proceeding were forthright, courageous and wounded by Respondent's treatment of them. He failed terribly as a leader.

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

Notwithstanding our findings, we find that Respondent still was entitled to written notice and an opportunity to remedy. In reaching this conclusion, we are reminded of the history of american jurisprudence and the importance of procedural justice. See Joint Anti-Fascist Refugee Committee v. McGrath, et al., 341 U.S. 123, 168 (Frankfurter, J., concurring: "This Court is not alone in recognizing that the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society."). Here, of course, we address contractual justice.

We note, as well, that the Company itself considered other remedies before deciding on termination for cause based on a major employment breach. See Transcript ("Tr.") at 277 (S. Viviano: "...we considered...a couple of things [including]...the reprimand of his life and scar[ing] him sort of into not demonstrating this type of behavior."): Tr. 278-80, 366-67, 1350-51, 1415-18, 1424-29, and 1431 (R. Crystal: "had he not denied it, maybe we could of have had the discussion.").

## FINDINGS OF FACT

### The Parties

According to the Statement of Uncontested Facts filed by the Parties with the Panel, Lerner is a wholly-owned subsidiary of NY&Co. and a retailer of women's apparel. Jasmine, which was purchased by Lerner in the summer of 2005, sells "upscale and contemporary apparel, footwear, and accessories." Mr. Manganella was at the time of purchase, and since the company's inception in 1970, the President, sole Shareholder, and sole founder of Jasmine. His wife, Stacey Manganella, served as an employee of the company starting in 1992 and in time became responsible for buying. By 2005, when it was sold to Lerner, the business had grown to about 17 locations.

As reflected in the Statement of Uncontested Facts, Respondent entered into a stock purchase agreement on July 19, 2005, by which Lerner agreed to purchase all of the shares of Jasmine for about $30 million.

At the time of the closing, Mr. Manganella entered into an employment agreement with Jasmine as the company's president. Simultaneously with the closing, Lerner deposited $7,000,000 of the purchase price into escrow pursuant to an escrow agreement among the parties and Goulston & Storrs, P.C., as escrow agent. The agreement provides that the deposit was "being made as security with respect to the Shareholder's obligations to pay liquidated damages of $7,000,000 in the event of a major employment breach pursuant to Section 6.16" of the SPA. The escrow agreement was amended and restated on February 28, 2006, whereby $3,5000,000 of the escrowed funds were released to Mr. Manganella and he deposited with the escrow agent 200,000 shares of common stock of NY&Co. which he owned.

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

**The Agreements**

Section 1.2(A) of the SPA describes the purchase price as $15.5 million in cash, the payment of $7 million into escrow, and the issuance to Respondent of 350,000 shares of NY&Co.'s common stock and following the closing the issuance of an additional 200,000 of such stock based on the satisfaction of certain conditions

Section 1.4 of the SPA references the deposit of $7 million into escrow pursuant to an escrow agreement "as security with respect to the Shareholder's obligations to pay liquidated damages of $7,000,000 in the event of a Major Employment Breach pursuant to Section 6.16."

Section 6.9 of the SPA refers to laws of the State of New York as the governing law.

Section 6.13 of the SPA refers to the right of Lerner to initiate arbitration set forth on Schedule 6.13 to assert a claim that a Major Employment Breach has occurred and to enforce its rights with respect to the same pursuant to Section 6.16.

Section 6.16(A) of the SPA provides that "the parties recognize that in the event of a Major Employment Breach, the actual damages to the Purchaser would be extremely difficult or impossible to determine, and that the amount of $7,000,000 represents the parties' reasonable estimate of such damages, and that such amount shall constitute liquidated damages payable to the Purchaser."

Section 6.16(E) of SPA provides that:

> the term 'Major Employment Breach' means the breach by the Shareholder of his Employment Agreement, provided such breach arises from either (I) the voluntary resignation by the Shareholder of employment with the Company; (II) the willful refusal of the Shareholder to comply with any significant, lawful and proper policy, directive or decision of the Company's Board of Directors or the Chief Executive Officer of the Issuer in furtherance of a legitimate business purpose or willful refusal to perform the duties reasonably assigned to the Shareholder by the Company's Board of Directors or the Chief Executive Officer of the Issuer and, in each case, only if not remedied within thirty days after receipt of written notice from the Company; or (III) the Shareholder's commission or conviction of, or a plea of guilty or no contest or similar plea with respect to, a felony, an act of fraud or embezzlement in each case against the Company; provided that in no event shall any breach be considered a Major Employment Breach to the extent arising from the death or disability of the Shareholder, and provided further that in

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

> no event shall a voluntary resignation by the Shareholder
> be considered a Major Employment Breach if such
> resignation is in response to: (1) a material breach by the
> Company of the Employment Agreement only if not
> remedied within thirty days after receipt of written notice
> from the Shareholder, or (2) the request by the Company to
> engage in (or refrain from reporting to the appropriate
> authorities) any conduct or activities which are not lawful
> only if not remedied within thirty days after receipt of
> written notice from the Shareholder.

Section 5 of Respondent's employment agreement with Lerner dated July 19, 2005 provides that:

> The Employment Period will continue until the earlier of:
> (i) the end of the Term; (ii) Executive's resignation for any
> reason, including death or Disability (as determined by the
> Board in good faith); or (iii) giving of notice of termination
> by the Company or a majority of the members of the Board
> (A) for Cause or (B) for any reason or for no reason (a
> termination described in this clause (iii)(B) being a
> termination by the Company "Without Cause").    For
> purposes of this Agreement, "Cause means (i) intentionally
> causing the Company to violate a material local state or
> federal law in any material respect; (ii) gross negligence or
> willful misconduct in the conduct or management of the
> Company not remedied within thirty days after receipt of
> written notice from the Company; (iii) willful refusal to
> comply with any significant, lawful, and proper policy,
> directive or decision of the Board or the Chairman in
> furtherance of a legitimate business purpose or willful
> refusal to perform the duties reasonably assigned to
> Executive by the Board and only if not remedied within
> thirty days after receipt of written notice from the
> Company; (iv) any willful or intentional act of Executive
> that has the effect of injuring the reputation or business of
> the Company or any of its Affiliates in any material
> respect, (v) any continued or repeated absence from the
> Company, unless such absence is (A) in compliance with
> Company policy or approved or excused by the Board or
> (B) is the result of the Executive's permitted vacation,
> illness, Disability, or incapacity, (vi) Executive's use of
> illegal drugs or repeated public drunkenness, or (vii)
> Executive's commission or conviction of, or a plea of
> guilty or no contest or similar plea with respect to, a felony,
> an act of fraud or embezzlement, a material breach of

8

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

_____

fiduciary duty to the Company or any of its equity owners, or a good faith breach of <u>Section 7</u>, <u>8</u>, <u>10</u> or <u>11</u> of this Agreement, and, in any case of <u>Section 7</u> only, not remedied within thirty days after receipt of written notice from the Company.  Notice given by the Company not to extend the Term under <u>Section 1</u> shall not constitute a termination for Cause or Without Cause.

### NY&Co. Code of Conduct

The Company's Code of Conduct in relevant part provides:

> Executive Officers, Directors, and Managers have the additional responsibility to lead by example, ensure that other Associates understand and comply with this Code, foster an environment that promotes compliance, and ensure that other Associates understand how to report concerns and understand that there will be no retaliation for doing so.
>
> \*\*\*
>
> We are committed to maintaining a workplace entirely free from illegal discrimination or harassment.  We will not tolerate harassment related to any individual's race, color, religion, gender, national origin, citizenship, age, disability, sexual orientation or marital status.
>
> \*\*\*
>
> The term "harassment" may include unwelcome slurs and other offensive remarks, jokes and other verbal, graphic or unwelcome physical conduct.   Harassment may also include unwelcome sexual advances, requests for sexual favors or unwelcome or offensive touching and other verbal, graphic or physical conduct of a sexual nature (such as obscene or lewd jokes, comments or displays or any inappropriate body contact). <u>See</u> Joint. Exh. 3.

The Code also provides that violations are harmful to the interests of the Company and that violators are subject to disciplinary action, up to and including termination of employment.

### History

The immediate events which led to this proceeding began on April 28, 2006, when a Jasmine employee resigned, giving various reasons for doing so and subsequently complaining of being sexually harassed by Mr. Manganella.

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

The Company opened an investigation of the complaint of sexual harassment and hired Howard T. Anderson of Stier Anderson, LLC, to conduct an investigation. Mr. Anderson proceeded to interview twelve then current employees of Jasmine, including Mr. Manganella, and the former employee who had complained of sexual harassment.

On May 25, Mr. Crystal met with Mr. Magnaella and read him a letter which stated that the Company "has received information alleging that" he may have violated its code of business conduct. The letter mentioned that a firm had been retained to investigate the matter and requested that he assist the investigation. The letter also said that no conclusions had been drawn as to the accuracy of the allegations, that he would be given an opportunity to respond, and that he should not discuss the investigation with present or former employees unless instructed to the contrary. Said the letter, as it is particularly relevant here: "You will be given every opportunity to understand and respond to the allegations .." The letter also stated that during the course of the investigation he was not to enter any of the premises of the company.

On June 6, Mr. Manganella met with Mr. Anderson, without the presence of counsel. During the course of his interview, Mr. Manganella said that he was aware of the code of conduct and he also identified the sexual harassment policy of Jasmine which was in effect prior to the sale of his business. In the interview he was read the definition of sexual harassment from the Jasmine policy (similar to the NY&Co. policy). He denied sexually harassing any woman employee of the Company, past or present. He was not told or asked about the allegations of sexual harassment made by the four women during the course of the investigation. In the interview he was shown photographs from his computer of a former employee with whom he had had a romantic relationship.

In the ensuing weeks, efforts by Mr. Manganella's counsel to obtain information about the specific allegations against his client were not successful. In a letter dated June 12, counsel for Mr. Manganella said that his client was shocked to learn that the Company had apparently accessed highly personal photographs which "he believed he had permanently deleted from a computer that he used" for business and personal purposes prior to the sale. By letter dated June 16, counsel for the Company said that the computer was company property and that any right to privacy was subject to the investigation. The letter also said that Mr. Manganella was advised of the nature of the allegations against him when he was interviewed and that if they are corroborated, Mr. Manganella "will have no one but himself to blame for adverse consequences on the business."

As for the investigation conducted by Mr. Anderson, he submitted a status report and summary of preliminary conclusions on June 11, which were reaffirmed in a letter dated June 20. See Joint. Exhs. 30 and 33. These reports essentially validated the allegations of sexual harassment.

On June 22, Mr. Crystal had hand delivered to Mr. Manganella a letter stating that his employment was being terminated for cause "based on corroborated violations of the Code of Business Conduct." The letter added: "Based on this investigation, it has been

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

determined that you engaged in behavior in direct violation of the Code of Business
Conduct's prohibition of harassment, its requirement to treat our associates professionally
and with respect at all times, and its standards on the use of Company assets. The Code
also requires us, as senior management, to lead by example, which you have also failed to
do."

By a separate letter from company counsel dated June 22, Mr. Manganella was informed
that there had been a major employment breach as defined in the SPA and, accordingly,
the company was entitled to the moneys held in the escrow account. The letter said that
he had willfully refused to comply with company policies, including the Code of
Business Conduct and its provisions relating to harassment. Among other things, the
letter said that he had "made unwelcome sexual advances, requests for sexual favors and
other verbal, graphic or physical conduct of a sexual nature (such as obscene or lewd
jokes, comments or displays) to at least four current Jasmine employees and possibly two
or more former Jasmine employees."

The Manganellas then brought state court proceedings in Massachusetts and Lerner sued
in federal court.

## DECISION AND DISCUSSION

We need not elaborate by extended discussion on the basis for our decision given the
comments of counsel as to the form of our award at the time of the closing arguments.
Suffice to say as follows:

Mr. Manganella willfully refused to comply with a significant policy dealing with sexual
harassment. The Oxford English Dictionary, a classic in its field, describes "willful" as
asserting or disposed to assert one's will contrary to instruction or command; headstrong;
obstinate; determined to have one's way. It defines "refusal" as the act of refusing, a
denial or rejection of something. See Shorter Oxford English Dictionary Fifth Edition,
2003. The record establishes a "willful refusal" within the well defined meanings of such
words, which we consider the SPA as reflecting.

Respondent's denial of his awareness of the policy on sexual harassment is not credible.
The evidence is compelling that Respondent was familiar with the Code of Conduct. It
was referred to in the letters of intent leading up to the SPA and in the agreements he
signed. See Joint Exhs. 1 and 4, and Respondent Exhs. 15 and 53. The evidence also
establishes that he received a copy of it shortly after the sale of his business and, while he
disputes ever hearing about it at a training session he and his wife had with Ms. Viviano,
we are hard pressed to accept that denial and we do not. See Tr. 137 and 142, and Joint.
Exh. 86. Nor do we accept his denial of attending any training session with Ms. Viviano.
The testimony of his wife was to the contrary and when he met with Mr. Anderson in
June 2006 and subsequently signed court documents, he mentioned the Code of Conduct
in a context indicating familiarity with the document. See Tr. 156-62, 1505, 2739-41,
and 2747, Joint Exh. 15, and Claimant Exh. 11. Of course, Respondent was also quite
familiar with the subject of sexual harassment from his time with Jasmine before the sale.

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

After being charged with sexual harassment in a federal court proceeding by a former employee of Jasmine in 1998, he had Jasmine's then policy on that subject updated to reflect the law of Massachusetts. See Tr. 1968. After the sale, he understood that Claimant had a policy demanding respect.

As to Respondent's compliance with the policy, his denials of sexual advances were not established but rather what was established by the record is that he sexually propositioned several women employees and inappropriately touched and propositioned one of these employees.

In evaluating the testimony of these employees, we have taken account of possible motives by them to lie and the fact that none of them reported the allegations to the Human Resources Office of the Company, except for one after she had resigned. Upon making a careful review of these facts, we find the merits of the allegations overwhelmingly established. Most significant is that two employees shared information at the time as to the incidents involving them with other employees of the Company. This is borne out by the interview statements of other employees made part of this proceeding. See Joint Exhs. 16-21.

As for the lack of any complaints brought by the women, the record indicates that Mr. Manganella had a strong personality and temper and a number of employees were reluctant to draw his ire, with some fearing consequences if they brought a complaint. For some employees the Human Resource Office was not trusted as one that would protect their confidences. This fear continued long after the sale of the business to Lerner. It also was contributed to by the lack of any training program for employees of Jasmine until the fall of 2006.

With respect to other material breaches which Respondent claimed had occurred, the evidence falls quite short of what is necessary to establish such breaches. The record indicates that Mr. Manganella had difficulty adjusting to a world of public companies, subject to regulation by the SEC and governed by statutes such as Sarbanes-Oxley. Moreover, it was difficult for him to accept even limitations in the area of Jasmine where he served as President but was only one member of a committee which made decisions with respect to real estate. Indeed, Mr. Manganella acknowledged in his testimony that he understood he no longer would have the kind of control he enjoyed prior to the SPA. See Tr. 2306-07.

As to the subject of notice and remedy, New York law permits in very limited circumstances a discharge of a party from the performance of futile acts or conditions precedent. When such a discharge should be effected is ultimately a matter of judgment based on all the facts. See Corbin and Needham, both supra. "Courts, using their good sense, will be able to tell breaches which excuse the obligation to give notice from breaches which do not. It is perhaps enough that they are aware that a distinction must be drawn here." Corbin at 874-75.

In parsing through the issues in this matter, we note the following:

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

First, Claimant did not establish that it gave the requisite "written notice" (SPA §§ 6.16(E); 6.8) to Respondent. Indeed, Claimant's CEO testified as follows:

Q:    "Now, at some point New York & Company did make a decision to claim a major employment breach and attempt to recoup the $7 million in escrow from Mr. Manganella, right?

A:    Yes.

Q:    And Mr. Crystal, just so I'm clear, when New York & Company made its major employment breach claim, <u>it had never given Mr. Manganella written notice of its claim of major employment breach prior to that date</u>, correct?

A:    Not that I would recall, no." <u>See</u> Tr. 1424 (emphasis added).

He also testified:

Q:    And you knew that the language in the stock purchase agreement[], major employment breach provision called for notice, right?

A:    In the agreement?

Q:    Yes.

A:    If it could be remedied, yeah.

Q:    Well, there's no language in here about if it could be remedied?

A:    I made the judgment that if you shot somebody you couldn't take it back, and this was in my opinion something [that] couldn't be remedied so there was no reason to give notice because it couldn't be corrected.

Q:    Well, the language of the stock purchase agreement said that there should be notice in each case, right?

A:    The issue wasn't the [stock purchase] agreement. It was violation of the company policy that we terminated for. We weren't looking to violate the [stock purchase] agreement. We were looking to protect our associates, protect the company.

Q:    Let me ask you this, then.

      You'll agree with me, won't you, that whether or not Mr. Manganella's failure to comply with the company's policy, would a willful refusal would have been a very simple question if you had given him notice of the specific allegations and instructed him never to engage in that behavior again, right?

A:    We believe that would not be, have been the case based on past history, which I explained before.

Q:    Well, if you told him specifically what conduct he had to stop and he said I refuse[] to stop, that would be a willful refusal, right?

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

A:    That would be, yes.

Q:    You chose not to do it that way, right?

A:    Yes, I did.

Id. at 1511-13 (emphasis added).

Moreover, when asked to address the existence, *vel non,* of the contractually required "written notice", Claimant's counsel was forthright in acknowledging that "[t]here is no question the company didn't do that":

ARBITRATOR KAVALER:  Are you going to address notice separately or is it included in what you said?

Let me try to understand your position.  Legally, you say futility excuses notice and factually, you say there was futility, therefore, there doesn't have to be notice, do I understand you correctly?

MR. SOLUM: Yes.

ARBITRATOR KAVALER:  That's a different way of saying you have nothing else to say about notice.  If you lose on futility you lose on notice.

MR. SOLUM:  Notice and remedy meaning -- notice under the contract means notice of the violations so in this case we didn't know he violated, we didn't conclude it.

ARBITRATOR KAVALER:  A purely mechanical point, notice under the contract requires a mechanical act, send a letter to somebody with a copy to somebody.

MR. SOLUM:  I'm getting to that.

ARBITRATOR KAVALER:  Have you addressed that or are you getting to that.

MR. SOLUM:  There is no point in giving the notice --

ARBITRATOR KAVALER:  We're saying the same thing.  You're saying -- you're going to the end of the notice and remedy provision and you're saying because it can't be remedied, it's futile, you're [saying] I'm excused from notice and remedy.

MR. SOLUM:  Correct.

ARBITRATOR KAVALER:  If we conclude it's not futile, then you should have given notice.  Notice is defined in the agreement as a mechanical act.  You have to write a letter to somebody at a certain address with a copy to somebody at a certain address.  There is no question the company didn't do that.

MR. SOLUM:  Correct.

14

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

ARBITRATOR KAVALER: That's all I'm trying to understand. So if we don't buy the futility argument, then you don't have . . . anything else to say on notice.

ARBITRATOR BARRETT: [What y]ou're arguing on the notice is that the notice doesn't exist in the air for no purpose, it exists to put somebody on notice that he has 30 days to cure something and if it is impossible or unfeasible to do the cure within 30 days, then obviously the notice is a useless act.

ARBITRATOR KAVALER: All three of us are saying the same thing. [Ex] the futility argument [, y]ou're not claiming you satisfied the mechanical notice requirement.

ARBITRATOR BARRETT: If you're point Tom is that futility is an important part of their case, I think you're right.

ARBITRATOR KAVALER: If I understood counsel [for Respondent] correctly, one of his theories is that because of the absence of notice, Mr. Manganella didn't know what he was required to respond to or remedy.

MR. SOLUM: That totally misses the point, the argument. Notice doesn't say you have to have notice of a potential violation before the company determined there was a violation, it doesn't say you have to call him every time you find out there might be a violation of a policy. It's exactly what the arbitrator's point was, you don't have to give notice a number of times throughout the process in various ways, it's either notice and remedy is futile or it's not.

ARBITRATOR BARRETT: You may have more than one notice, you may have a notice of the pendency of the investigation to make a better investigation upon the conclusion of which you may give another notice [that] now we have found a major employment breach, you have 30 days to cure. It could have worked that way but it didn't.

ARBITRATOR KAVALER: And it could have worked seven other ways, but focusing on the notice element, the contract specifies a mechanical form of notice, that was not given, there is no dispute about that. [Claimant's] argument is [it] doesn't need to be and [Respondent's] argument is it does need to be.

MR. SOLUM: Notice wasn't given until June 22 when he was terminated.

Summation Transcript, Feb. 27, 2007 at pp. 268-72 (emphasis added).

Claimant's counsel argued that "written notice" should be understood to mean "notice and remedy" and thus, because in Claimant's view no remedy was possible as a matter of law, the contractually mandated "written notice" was excused. We note the proffered

15

13 116 Y 01508 06  Lerner New York, Inc. and Luciano Manganella

---

reading of the contract would conflate these two terms, notwithstanding the well established proposition of New York law that contracts are to be read so as to give meaning to each and every term thereof, and no language is to be construed as mere surplusage. See, e.g., McCabe V. Witteveen, 34 A.D.3d 652 (N.Y. App.Div. Nov. 21, 2006); Creative Waste Mgmt., Inc. v. Capitol Environ. Sys., Inc., ___ F. Supp.2d ___, No. 04-civ-9581, 2006 WL 3190350 (S.D.N.Y. Nov. 2, 2006); Conzo v. City of New York, 438 F.Supp.2d 432, 435 (S.D.N.Y. 2006).

Turning to the question of remedy itself, we read the contract as requiring an opportunity to offer a remedy which may or may not have been possible in the circumstances of this proceeding. As previously noted in our Summary of Findings, Claimant actually considered internally the question of remedies but concluded with the decision to terminate for cause rather than provide Respondent with an opportunity to be part of a remedial engagement looking at other alternatives.  Thus, Ms. Viviano testified as follows:

> Q:  ...And you acknowledge that there were other possible actions in response to the allegations against Mr. Manganella, correct?
>
> A:  Yes
>
> Q:  And you described some of them?
>
> A:  Yes, I did.
>
> Q:  And you described the possibility of separating Mr. Manganella from the employees in question, correct?
>
> A:  Yes.
>
> Q:  And you described the possibility of having Mr. Crystal have a talk with Mr. Manganella – I think you said the warning of his life, is that correct?
>
> A:  We considered that.
>
> Q:  All right.
>
> And you could have also sent Mr. Manganella out for training, right?
>
> A:  Yes, we considered that.
>
> Q:  You could have sent him to sensitivity training or other types of behavioral medication training, correct?
>
> A:  Correct.
>
> Q:  And you could have consulted a professional with respect to possible behavior modification alternatives for Mr. Manganella, correct?
>
> A:  We could have.

13 116 Y 01508 06  Lerner New York, Inc. and Luciano Manganella

---

Q:    And as a human resources professional, you know these are all
      things that can be appropriate remedies in the case of alleged
      sexual harassment, correct?

A:    Yes.

Q:    The code of conduct has a waiver provision in it, does it not?

A:    Yes, it does.

Q:    And you knew that you had the ability, or the company had the
      ability to waive any alleged violations of the code of conduct,
      right?

A:    Yes.

Q:    And you decided not to make such a waiver, correct?

A:    That is correct.

See Tr. 367 – 9.

In the end, we come back to the framing of Corbin and the court in Needham as to when
to discharge parties from notice and remedy provisions, namely, adjudicatory tribunals
"using their good sense, will be able to tell breaches which excuse the obligation to give
notice from breaches which do not." In making that distinction, we have taken account
of the following:

From the standpoint of Claimant, we start by noting its legal and moral obligations to
have a workplace free from sexual harassment and the importance to an effective
working environment of employees being able to do their work free of the presence of
sexual abuse. We have considered the consequences, internally and externally, of the
retention of someone like Respondent who exercised a position of leadership and was
contractually bound to meet the requirements of that position. We have thought about the
practicality in a small business of placing him in a different position where he would not
have to interface with women employees. We have  reflected on the feasibility of
traditional remedies of reprimands, suspensions, training programs, and even  a group
solving problem kind of approach  We have taken account as well of the testimony of the
women employees as to their views of providing Respondent with a remedy.  We have
included in our considerations the effects of his conduct on the women employees who
remain in the employ of Claimant, as best we could divine those effects from the record.
Needless to say, Respondent did not help his case by lying to the Panel in this
proceeding.

From the standpoint of Respondent, we have taken account of the fact that the money in
escrow at the core of this proceeding was part of the purchase price for a business he
developed over a great many years, attracting a company like NY&Co  to purchase it for
a fair value of $30 million. See Tr. 442 and 483.  Of course, his termination leaves
unclear the extent of the damage done to Claimant by his removal from the business he
knew so well. Some testimony was given on the subject of damage but not a great deal.
We have treated in our deliberations the philosophy of the EEOC, embodied in the law

17

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

creating it, which encourages parties to find resolutions to even the most egregious of misconduct, as touched on in the testimony by Mr. Casellas. We have read the testimony of other women employees who submitted interview statements to Mr. Anderson. We have noted also that Claimant itself considered other alternatives as admitted by both its president and human resources expert.  We have considered the lack of any need for immediacy in making a decision without notice and remedy because Respondent was on administrative leave and Claimant could have continued him on leave as it dealt with the Hobson's choice of termination or not in a notice/remedy process.  As we see it, Claimant also could have terminated Respondent on other grounds, without resort to the major employment breach provision, and  it could have terminated him even on that ground if he were provided with notice and remedy and an acceptable alternative were not found. We can't rule out the possibility of such an approach being found. It is even possible that Claimant might have admitted his misconduct without going through a process such as the one ending with us.  Finally, we have not been able to exclude the possibility that the availability of $7 million was part of the decision-making mix given its emergence at the very beginning of the investigatory process. See Tr. 267-68.

After weighing all these considerations, we have done our best to do justice in this difficult matter.

**Interest**

In a letter to Hon. Morris E. Lasker, dated July 12, 2006, Claimant agreed "to pay [Respondent] interest on the funds in the Escrow Account above the interest being earned in the account up to Prime plus 3% from the date an injunction is issued [viz., July 12, 2006) to the date of the ruling by [this Panel] in the event [Respondent] is successful in that arbitration."

**Attorneys' fees**

We find that Claimant is obligated to pay to Respondent "all [his] attorneys' fees and costs" of this arbitration as well as "the fees and expenses of the Arbitration Panel and the AAA" (SPA Schedule 6.13(c)).

We are severing for further proceedings the determination of the amount of such attorneys' fees.

**INTENTIONALLY BLANK**

13 116 Y 01508 06   Lerner New York, Inc. and Luciano Manganella

---

## AWARD

Accordingly, we award as follows (final subject only to paragraph 3 below):

1.  The Escrow Amount shall go to Respondent. To the extent that the Escrow Agent requires an order of this Panel to disburse the Escrow Amount to Respondent (SPA Schedule 6.13(i)), it is so ordered.

2.  With respect to interest Claimant shall pay to Respondent the sum of Three Hundred and Five Thousand Two Hundred and Ninety One Dollars and Twenty Five Cents ($305,291.25) as of the date hereof and $1,078.77 per day thereafter until Respondent receives the Escrow Amount.

3.  Respondent shall make not later than April 30, 2007 a showing by affidavit of the amounts thereof that he has incurred or that may otherwise be or become due. Claimant shall respond thereto not later than May 14, 2007 and Respondent may reply, if so advised, not later than May 24, 2007. The Panel shall thereafter issue a Final Award thereon not later than July 2, 2007 without any further argument unless the Panel requires same.

4.  Pursuant to SPA Schedule 6.13(g), the AAA is instructed to send a copy hereof to the Escrow Agent, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, MA 02110-3333 Attn: Matthew E. Epstein, Esq., forthwith.

5.  This Award shall remain in full force and effect until such time as a Final Award is rendered. The Panel retains jurisdiction until the issuance of the Final Award.

This award may be signed by the arbitrators in counterparts.

Dated: New York, New York
      April   , 2007

 

_____
John D. Feerick, Chairperson


_____
W.L.D. Barrett, Member


_____
Thomas J. Kavaler, Member

13 116 Y 01508 06  Lerner New York, Inc. and Luciano Manganella

_____

       I, John D. Feerick, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my award.


_____         _____
    (DATE)                           (SIGNATURE)


       I, W.L.D. Barrett, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my award.


_____         _____
    (DATE)                           (SIGNATURE)


       I, Thomas J. Kavaler, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my award.


_____         _____
    (DATE)                           (SIGNATURE)